1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JASON B. PERKINS,                          No.  1:19-cv-00126-NONE-EPG

12               Plaintiff,

13        v.                                     ORDER DENYING PLAINTIFF'S MOTION
                                                 FOR SUMMARY ADJUDICATION
14   CITY OF MODESTO, MODESTO
     POLICE DEPARTMENT, GALEN L.                 (Doc. No. 34)
15   CARROLL, JERRY J. RAMAR, and
     RYAN OLSON,
16
                 Defendants.
17

18

19                               **INTRODUCTION**

20        Plaintiff Jason B. Perkins filed this lawsuit against defendants City of Modesto, Modesto

21   Police Department ("MPD"), MPD Chief of Police Galen L. Carroll in his individual capacity,

22   MPD officer Jerry J. Ramar ("Ramar") in his individual capacity, and MPD officer Ryan Olson

23   ("Olson") in his individual capacity, after plaintiff was shot multiple times by officer Ramar.

24   (Doc. No. 22.)  In his complaint, plaintiff asserts claims under the Fourth and Fourteenth

25   Amendments to the United States Constitution, Article I, § 13 of the California Constitution, and

26   various state statutes.  (*Id.*)  Currently pending before the court is plaintiff's motion for summary

27   adjudication, seeking an order finding that based upon the evidence before the court officer

28   Ramar's use of deadly force was unreasonable and excessive in violation of plaintiff's rights

                                              1

1  under the Fourth Amendment and, relatedly, that qualified immunity does not shield Ramar from

2  liability.  (Doc. No. 34.)  For the reasons discussed below, plaintiff's motion for summary

3  adjudication will be denied.

**FACTUAL BACKGROUND**

A.      **The Factual Record**

6         Plaintiff has submitted a statement of undisputed material facts (Doc. No. 34-2), a report

7  of an interview with Ramar conducted by MPD's Investigative Services Division (ISD) on

8  November 7, 2017 (Doc. No. 34-4), video footage from both Olson's and Ramar's body cameras

9  (Doc. Nos. 34-5 (Olson Bodycam), 34-9 (Ramar Bodycam)), a computer-aided dispatch (CAD)

10  response report (Doc. No. 34-8), and MPD policy documents regarding portable video recording

11  systems, portable audio and video recorders, and the use of force generally (Doc. Nos. 34-6, 34-7,

12  34-10).  In opposition to plaintiff's motion, defendants have submitted a declaration from Ramar

13  (Doc. No. 36-1 at 4), a report of plaintiff's interview conducted by ISD (Doc. No. 36-1 at 9),

14  defendants' response to plaintiff's statement of undisputed material facts (Doc. No. 36-2), and

15  defendants' separate statement of undisputed material facts (Doc. No. 36-3).  In reply, plaintiff

16  has submitted responses and objections to defendants' statement of undisputed material facts.

17  (Doc. No. 37-1.)

18         Below, the court first provides a roughly chronological overview of the relevant events,

19  based on any undisputed facts as well as disputed facts viewed in the light most favorable to the

20  non-moving parties (i.e., defendants).[1]  In addition, the court has reviewed the body camera video

21  footage, keeping in mind the Supreme Court's admonition that where there is video evidence of

22  an incident giving rise to an excessive force claim, a court must "view[] the facts in the light

23  depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).  Finally, because

24  officer Ramar's asserted perspective of the events in question is critical to the court's resolution

25  /////

26

27  ────────────────────
[1]  Unless otherwise noted, the facts are derived from plaintiff's statement of undisputed material
facts, (Doc. No. 34-2), and defendants' responses to those allegedly undisputed material facts,

28  (Doc. No. 36-2).

2

1  of the pending motion, the court has carefully reviewed both Ramar's declaration and the report

2  generated following his ISD interview.

3  **B.  Factual Summary**

4  On November 6, 2017, Ramar was a sergeant assigned to the traffic unit of MPD.  (Doc.

5  No. 36-2 ¶ 1.)  Throughout the events described below, Ramar was acting within the scope of his

6  employment with MPD.  (*Id*. ¶ 2.)

7  At approximately 9:30 a.m. on November 6, 2017, Ramar was on duty and heard dispatch

8  broadcast that plaintiff, who was wanted for brandishing a firearm[2] at a Turlock Police

9  Department officer, was spotted driving a black Infiniti in the parking lot of the Stanislaus County

10  traffic court.  (*Id*. ¶ 4.)  Ramar, who was on motorcycle patrol, first responded to the traffic court,

11  but then received an update that plaintiff had moved to the parking lot of a Big Lots department

12  store.  (*Id*. ¶ 5.)  Ramar responded to that location and identified a black Infiniti in the nearby

13  Bank of America parking lot.  (*Id*. ¶ 6.)[3]  Ramar then parked his motorcycle some distance from

14  the Bank of America parking lot and waited for backup to arrive.  (*Id*. ¶ 7.)

15  While waiting, Ramar received additional updates regarding plaintiff.  (*Id*. ¶ 8.)  He was

16  informed that plaintiff was wanted on another warrant in addition to the one for brandishing a

17  firearm at a police officer, and that plaintiff was considered "armed and dangerous."  (*Id*.)  Olson

18  eventually arrived by motorcycle at Ramar's location.  (*Id*. ¶ 9.)

19  MPD equips its officers with portable video recording systems ("PVRS"), which officers

20  must activate for "[a]ll enforcement and investigative contacts including stops," "[t]raffic stops

21  including . . . all crime interdiction stops," "Code-3 responses," and in other situations.  (*Id*. ¶ 11.)

22  The encounter underlying this litigation implicated "a number of these situations," including that

23  it was broadcasted by dispatch as calling for a "Code-3" response.  (*Id*. ¶ 12.)  While Olson

24  ───────────────

25  [2]  The parties' statements of fact in connection with the pending motion for summary adjudication
focus on the warrant being for the crime of "brandishing" a firearm.  However, Ramar avers in his
26  declaration that he was informed that plaintiff was "wanted for recently brandishing or *assaulting*
a Turlock Police Officer with a firearm."  (Doc. No. 36-1 ¶¶ 4, 5 (emphasis added).)

27  [3]  The body camera footage depicts the Big Lots parking lot as being connected to the Bank of
28  America parking lot.  (*See* Olson Bodycam at 17:45:11.)

activated his PVRS prior to approaching plaintiff, in compliance with MPD policy, Ramar did not.  (*Id*. ¶¶ 13, 14.)

Ramar and Olson drove their motorcycles into the Bank of America parking lot in a single file, with Ramar in front.  (*Id*. ¶ 15.)  The black Infiniti that plaintiff was reportedly driving was parked directly in front of the Bank of America building.  (*Id*. ¶ 16.)  Ramar and Olson parked their motorcycles one parking-lot row behind the black Infiniti and dismounted from their motorcycles.  (*Id*. ¶ 17.)  Ramar immediately drew his firearm and moved towards the black Infiniti.  (*Id*. ¶ 19.)[4]  Olson trailed Ramar as he approached that car.  (*Id*. ¶ 23 (denying plaintiff's assertion that Olson was following "closely"); Olson Bodycam at 17:45:25–29 (showing the officers take a slightly different path between cars while approaching the black Infiniti).)

The driver's-side window of the black Infiniti was rolled down when Ramar and Olson began their approach.  (*Id*. ¶ 24.)  As Ramar got closer to the driver's side of the vehicle, he yelled: "Show me your hands!  Show me your hands, or I'm going to shoot you!"  (*Id*. ¶ 25.)  Plaintiff, who was sitting in the driver's seat of the black Infiniti, looked in Ramar's direction as Ramar approached.  (*Id*. ¶ 26.)  Ramar saw plaintiff place his hands down and put the vehicle in reverse.  (*Id*. ¶ 27.)  Plaintiff then leaned forward, as if he was reaching for something.  (*Id*. ¶ 28.)  The driver's-side window started to roll up (*id*. ¶ 29), as the vehicle began to move backward slightly.  (*Id*. ¶ 30.)

Ramar then fired two shots at plaintiff ("first volley"), although the precise timing of those shots relative to the window rolling up and vehicle beginning to move backwards slowly is unclear.  (Doc Nos. 34-2 ¶ 31 (plaintiff asserting that "less than a second" after the window started to roll up and the vehicle started to move in reverse, Ramar fired the first volley); 36-2 ¶ 31 (defendants disputing the timing of the window rolling up, the vehicle moving back, and the first volley, which, according to defendants,  all "appear to happen simultaneously").)  One of the shots struck and broke the driver's-side window which had started to roll up.  (Doc. No. 36-2 ¶

---

[4]  The parties dispute whether Ramar, after dismounting his motorcycle and prior to making contact with plaintiff, confirmed whether Olson was prepared to provide him backup.  (Doc. Nos. 34-2 ¶ 20; 36-2 ¶ 20.)  The parties also dispute whether Olson was actually ready to provide backup.  (Doc. Nos. 34-2 ¶ 21; 36-2 ¶ 21.)

1   32.)  Thereafter, the black Infiniti moved backward several yards until it stopped on top of a bark-

2   landscaped island in the Bank of America parking lot.  (*Id*. ¶ 33.)

3        Ramar and Olson then approached the black Infiniti again with their firearms pointed at

4   plaintiff.  (*Id*. ¶ 34 (defendants denying that Ramar and Olson were "standing next to the driver's-

5   side door" at that point); *but see* Olson Bodycam at 17:45:38–41 (showing Ramar and Olson

6   standing less than a car's width from the driver's side door).)  Ramar then yelled: "Let me see

7   your hands!  Let me see your hands!"  (Doc. No. 36-2 ¶ 35 (denying "as to the timing of the

8   commands . . . [relative] to the shots")[5].)  Plaintiff raised his right hand only, which was "visibly"

9   empty.  (*Id*. ¶ 36.)  Ramar then fired another two shots at plaintiff ("second volley").  (*Id*. ¶ 37.)

10  After this second volley of shots, plaintiff moved in the vehicle.  (Doc. Nos. 34-2 ¶ 33

11  ("Plaintiff's body slumped to the right side."); 36-2 ¶ 33 ("Deny.  Plaintiff continued to move

12  inside the car.").)  Ramar yelled: "Show your hands!  Show your hands!"  (Doc. No. 36-2 ¶ 39.)

13  The parties also dispute plaintiff's response to this command.  (Doc. Nos. 34-2 ¶ 40 ("Plaintiff

14  began to turn towards Defendants Ramar and Olson."); 36-2 ¶ 40 ("Deny.  Plaintiff did not move

15  towards Ramar or Olson prior to the fifth and sixth shots.").)  Ramar then fired two more shots at

16  plaintiff ("third volley").  (Doc. No. 36-2 ¶ 41.)

17       After this third volley of shots, Ramar continued to demand that plaintiff show his hands.

18  (*Id*. ¶ 42.)  Plaintiff responded that he could not because his arm was disabled due to the gunshot

19  wounds that he had just suffered.  (*Id*. ¶ 43.)  Plaintiff was then removed from the vehicle by the

20  officers and handcuffed.  (*Id*. ¶ 45.)  He sustained gunshot wounds to the jaw, chest, and left arm.

21  (*Id*. ¶ 44.)  As defendants concede in their opposition to the pending motion, plaintiff was

22  unarmed during this encounter.  (Doc. No. 36 at 9 n.1.)

23       Although the parties dispute exactly when Ramar activated his PVRS (Doc. No. 36-2

24  ¶ 46), the evidence before the court on summary judgment establishes that approximately a

25  minute after the last volley of shots were fired, Ramar's body camera was activated and began to

26

---

27  [5]  This particular denial, which is associated with plaintiff's statement of undisputed fact # 36,
    was clearly intended to address plaintiff's statement of undisputed fact #35.  In any event,
28  defendants do not deny that plaintiff raised his right hand.

1  capture a video recording from his perspective.  (*See* Olson Bodycam at 17:45:44; Ramar

2  Bodycam at 17:47:59.)[6]

3  **C.     Ramar's Declaration**

4      In his declaration submitted in opposition to the pending motion for summary

5  adjudication, Ramar avers that on the day in question, he heard dispatch announce that a

6  "wanted" individual was just spotted at the Stanislaus County traffic court parking lot.  (Doc. No.

7  36-1, Ex. A ¶ 4.)  Dispatch also broadcasted that the individual, later identified as plaintiff, was

8  wanted for brandishing or assaulting a Turlock Police Department officer with a firearm.  (*Id.*)

9  As he was driving to the traffic court, Ramar received an update that plaintiff had moved to the

10  Big Lots parking lot, which is where Ramar happened to be when he received the update from

11  dispatch.  (*Id.*)  Ramar identified plaintiff's vehicle as it was parking in front of the Bank of

12  America building, in the northeastern-most parking spot.  (*Id.*)

13      Dispatch confirmed that plaintiff's vehicle was near the Bank of America building, where

14  Ramar observed it parking.  (*Id.* ¶ 5.)  The source of dispatch's information regarding plaintiff's

15  location was a bail bondsman, which Ramar found to be credible based on his law enforcement

16  experience.  (*Id.*)  Ramar again received confirmation that plaintiff had assaulted a police officer

17  with a firearm and that there was a warrant for plaintiff's arrest.  (*Id.*)  Dispatch also informed

18  Ramar that plaintiff was armed and should be considered dangerous.  (*Id.*)  Based upon this

19  dispatch information, Ramar considered plaintiff to be dangerous and violent.  (*Id.*)

20      The bail bondsman had advised dispatch that the passenger in plaintiff's vehicle had

21  exited and was at the ATM.  (*Id.* ¶ 6.)  Because plaintiff was then the sole occupant of the vehicle,

22  Ramar believed this was the safest scenario to arrest plaintiff.  (*Id.*)  Ramar drove his motorcycle

23  a half block away from the Bank of America building, where he waited for Olson to arrive.  (*Id.*

24  ¶ 7.)  Ramar's plan was to take plaintiff into custody.  (*Id.*)

25      After Olson arrived at Ramar's location and the two officers entered the Bank of America

26  parking lot, a Ford Focus pulled into a parking spot one row behind plaintiff's vehicle.  (*Id.* ¶ 8.)

27

28

---

[6]  Although the two body camera videos are timestamped, there is a difference of roughly a minute in the time reflected on the two videos.

1   Ramar and Olson parked behind the Ford Focus because Ramar wanted adequate "cover" from

2   plaintiff.  (*Id.*)  Ramar's plan was to move from his motorcycle quickly to get in front of the Ford

3   Focus because he did not want that driver between him and plaintiff.  (*Id.*)  Ramar got off his

4   motorcycle, moved towards plaintiff, and unholstered his firearm.  (*Id.* ¶ 9.)  Plaintiff looked at

5   Ramar, who was in uniform, as he approached plaintiff.  (*Id.* ¶ 11.)

6   Ramar pointed his gun at plaintiff and yelled twice, "Show me your hands!"  (*Id.*)

7   Plaintiff's driver's-side window was rolled down, and Ramar believed that plaintiff could hear

8   him.  (*Id.*)  According to Ramar, as he got closer, plaintiff was reaching in the compartment area

9   of his vehicle.  (*Id.*)  Ramar was in fear that plaintiff was reaching for a firearm and yelled: "I am

10  going to shoot you!"  (*Id.*)  Plaintiff failed to comply with Ramar's commands, said nothing, and

11  turned away from Ramar and towards the center console of the vehicle.  (*Id.*)  Ramar saw what he

12  thought was a gun in plaintiff's right hand.  (*Id.*)[7]  Then, almost simultaneously, plaintiff started

13  to roll up his darkly tinted driver's-side window and the car began to move in reverse.  (*Id.*)

14  Ramar then fired the first volley of shots out of fear that plaintiff would shoot him.  (*Id.*)[8]

15  After the black Infiniti came to a stop on the parking lot island, Ramar and Olson walked

16  towards plaintiff.  (*Id.* ¶ 13.)  Ramar knew that his shots had hit plaintiff and wanted to reassess if

17  plaintiff still posed a threat to him and Olson.  (*Id.*)  Ramar then yelled twice, "Let me see your

18  hands!"  (*Id.*)  Ramar did not see plaintiff "show . . . his two hands" and plaintiff said nothing.

19  (*Id.*)  Ramar then fired the second volley of shots out of fear that plaintiff would shoot him.  (*Id.*)

20  Ramar believed that these two shots also hit plaintiff.  (*Id.*)  According to Ramar, at the time he

21  /////

---

22  [7]  Plaintiff denies anything suspicious about his right hand or its movement at the moment in

23  question.  When interviewed by ISD, plaintiff was asked whether he was simulating that he had a
gun when the officers approached him and he "said no."  (Doc. No. 36-1 at 11.)  Plaintiff was also

24  asked if he had anything in his hands at the time and he responded "no."  (*Id.*)

25  [8]  When interviewed by ISD, plaintiff stated that he did not hear Ramar's commands prior to the

26  first volley of shots being fired and instead stated that "the officers just started shooting and he
decided to get out of there."  (Doc. No. 36-1 at 11.)  However, during that interview plaintiff did

27  not claim that "the officers didn't say anything to him, just that he does not remember."  (*Id.* at
13.)  Plaintiff also denied that he was trying to get away from the officers when he put his vehicle

28  in reverse.  (*Id.* at 12.)  Instead, he claimed that he did so because "he 'freaked out.'"  (*Id.* at 11.)

1  fired this second volley, Olson was not standing "next" to him.  (*Id.*)  Instead, Ramer averred that

2  Olson was standing at an unknown distance to his right.  (*Id.*)[9]

3      After the second volley of shots, plaintiff turned toward the center console of his vehicle

4  and was moving.  (*Id.* ¶ 14.)  Ramar yelled twice, "Show your hands!"  (*Id.*)  Plaintiff did not

5  show his hands.  (*Id.*)  Ramar still considered plaintiff a significant threat to Olson and himself at

6  that time.  (*Id.*)  Ramar then fired the third volley of shots, again purportedly out of fear that

7  plaintiff would shoot him.  (*Id.*)  Ramar believed that he had again hit plaintiff with the third

8  volley of shots.  (*Id.*)

9      After the third volley, Ramar continued to demand that plaintiff show his hands.  (*Id.*

10  ¶ 15.)  Ramar believed by this time that plaintiff could not move, and plaintiff also stated that he

11  could not move.  (*Id.*)  By this point, Ramar no longer considered plaintiff a threat to him, Olson,

12  other officers who had arrived on scene or bystanders.  (*Id.*)  Ramar did not fire again.  (*Id.*)

13      According to Ramar, he mistakenly did not activate his PVRS prior to the shooting

14  incident with plaintiff.  (*Id.* ¶ 16.)  While Ramar was standing near the driver door after firing the

15  third volley of shots at plaintiff, he activated his PVRS.  (*Id.*)

16      **D. Ramar's Interview with ISD**

17      In support of his motion for summary adjudication, plaintiff submits the report of an

18  interview with Ramar conducted by ISD the day after the shooting.  (Doc. No. 34-4.)  As set forth

19  below, viewing the facts in the light most favorable to defendants, Ramar's ISD interview was

20  generally consistent with his subsequent declaration even though it included some additional

21  facts.

22      At his ISD interview, Ramar stated as follows.  After he got off his motorcycle and was

23  approaching the black Infiniti, plaintiff looked back and forth at him "frantically."  (*Id.* at 5.)

24  Ramar saw plaintiff put his hands down and put the car in reverse.  (*Id.*)  After Ramar yelled his

25  first set of commands, plaintiff leaned forward as if he was reaching for something and Ramar

26

27  [9]  Ramar has stated that Olson was not "next" to him at the time he fired the second volley of
    shots.  The body camera footage shows that Olson was standing several feet to the right of Ramar

28  at that time.  (*See* Olson Bodycam at 17:45:38.)

1  believed that plaintiff was reaching for a firearm.  (*Id.*)  As the driver's window of plaintiff's

2  vehicle started to roll up, Ramar saw an object in plaintiff's right hand which he thought was a

3  gun.  (*Id.*)

4  After he fired the first volley of shots and plaintiff's vehicle backed up onto the bark-

5  landscaped parking lot island, Ramar approached the vehicle and saw plaintiff still reaching

6  down.  (*Id.* at 6.)  Ramar then fired the second volley of shots.  (*Id.*)  Ramar again instructed

7  plaintiff to show his hands, but plaintiff was still reaching towards the floorboard of the vehicle.

8  (*Id.*)  Ramar then fired the third volley of shots.  (*Id.*)  After doing so, Ramar "started to assess

9  [plaintiff] as he was in the vehicle."  (*Id.*)  Ramar saw that plaintiff had gunshot wounds to the

10  neck, chest, left arm, and possibly to the right arm, though Ramar was unsure.  (*Id.*)  Given his

11  observations, and because plaintiff told officers he could not raise his hands, Ramar at that point

12  believed that plaintiff might be paralyzed.  (*Id.*)[10]

13  **LEGAL STANDARD**

14  Summary judgment is appropriate when the moving party "shows that there is no genuine

15  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

16  Civ. P. 56(a).  In summary judgment practice, the moving party "initially bears the burden of

17  proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig*., 627 F.3d

18  376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving

19  party may accomplish this by "citing to particular parts of materials in the record, including

20  depositions, documents, electronically stored information, affidavits or declarations, stipulations

21  (including those made for purposes of the motion only), admissions, interrogatory answers, or

22  other materials" or by showing that such materials "do not establish the absence or presence of a

23  genuine dispute, or that the adverse party cannot produce admissible evidence to support the

24  fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  If the moving party meets its initial responsibility, the

25  burden then shifts to the opposing party to establish that a genuine issue as to any material fact

26  actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586

27

28

---

[10]  At no time has Ramar stated that he thought plaintiff was paralyzed prior to Ramar's firing of the third volley of shots.

(1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Wool v. Tandem Computs., Inc*., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv*., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth*., 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Undisputed facts are taken as true for purposes of a motion for summary judgment.  *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . ..  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

10

1    Finally, where there is video evidence of the incident giving rise to the excessive force

2    claim, a court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550

3    U.S. 372, 380–81 (2007 ) (explaining that courts should not rely on "such visible fiction" that "is

4    so utterly discredited by the record"); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th

5    Cir. 2018) ("The record is viewed in light most favorable to the nonmovants . . . , so long as their

6    version of the facts is not blatantly contradicted by the video evidence[.]") (citations omitted).

7    Nonetheless, even where video evidence exists, the circumstances may be such that reasonable

8    factfinders could draw divergent conclusions from what the video evidence shows. *See S.R.*

9    *Nehad v. Browder*, 929 F.3d 1125, 1132–39 (9th Cir. 2019) (disputed issues of material fact

10   precluded summary judgment in an action alleging excessive use of force even though the

11   evidence included surveillance footage); *Glenn v. Washington County*, 673 F.3d 864, 878 (9th

12   Cir. 2011) ("The circumstances of this case can be viewed in various ways, and a jury should

13   have the opportunity to assess the reasonableness of the force used after hearing all the

14   evidence.").

15   Below, the court will consider each of the arguments advanced in support of plaintiff's

16   motion for summary judgment under these standards.

17                                    **DISCUSSION**

18   Title 42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges,

19   or immunities secured by the Constitution or laws of the United States" by a person acting "under

20   color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635,

21   639 (1980).  To succeed on his § 1983 claim, plaintiff must demonstrate that the action (1)

22   occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or

23   federal statutory right. *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988) (citations omitted);

24   *see also West v. Atkins*, 487 U.S. 42, 48 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

25   Qualified immunity is an affirmative defense that "shield[s] an officer from personal

26   liability when an officer reasonably believes that his or her conduct complies with the law."

27   *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).  The doctrine "protects government officials

28   'from liability for civil damages insofar as their conduct does not violate clearly established

1    statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* at 231

2    (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mullenix v. Luna*, 577 U.S.

3    ____, 136 S. Ct. 305, 308 (2015).   As the party moving for summary judgment, here plaintiff

4    must demonstrate that there is an "absence of evidence" that defendants are entitled to qualified

5    immunity.  *See Atkinson v. Cty. of Tulare*, 790 F. Supp. 2d 1188, 1201, 1213 (E.D. Cal. 2011)

6    (quoting *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)) (denying

7    plaintiff's motion for summary adjudication on excessive force grounds).

8         To determine whether officers are entitled to qualified immunity requires a two-step

9    inquiry.  "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's

10   allegations, if true, establish a constitutional violation."  *Wilkins v. City of Oakland*, 350 F.3d 949,

11   954 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "Second, if the plaintiff

12   has satisfied this first step, the court must decide whether the right at issue was 'clearly

13   established' at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 231.

14   Therefore, here if plaintiff fails to establish the first step, the court need not address the second

15   step of the qualified immunity analysis.  *See id.*

16   **A.      The Claimed Constitutional Violation: Excessive Force**

17        Under the Fourth Amendment, "[t]he right of the people to be secure in their persons,

18   houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

19   no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "The Fourth

20   Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those

21   which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see*

22   *also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the

23   Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force

24   or show of authority, in some way restrains the liberty of a citizen.").

25        The Fourth Amendment requires law enforcement officers making an arrest to use only an

26   amount of force that is objectively reasonable in light of the circumstances facing them.  *Graham*

27   *v. Connor,* 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Determining

28   the objective reasonableness of a particular use of force, requires balancing the "nature and

12

1   quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

2   governmental interests at stake." *Graham*, 490 U.S. at 396.  Under this standard, "'[t]he force

3   which [i]s applied must be balanced against the need for that force:  it is the need for force which

4   is at the heart of the *Graham* factors.'"  *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 (9th Cir.

5   1997) (quoting *Alexander v. City & Cty. of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994));

6   *see also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).

7   Thus, in light of the facts and circumstances surrounding an officer's actions, courts "must

8   balance the nature of the harm and quality of the intrusion on the individual's Fourth Amendment

9   interests against the countervailing governmental interests at stake."  *Bryan v. MacPherson*, 630

10  F.3d 805, 823 (9th Cir. 2010) (internal quotations and citation omitted); *see also Scott*, 550 U.S.

11  at 383–84; *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001); *Liston*, 120 F.3d at 976.

12  Thus, "[f]orce is excessive when it is greater than is reasonable under the circumstances."  *Santos*

13  *v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (citing *Graham*, 490 U.S. 386).

14          "Because the test of reasonableness under the Fourth Amendment is not capable of precise

15  definition or mechanical application, however, its proper application requires careful attention to

16  the facts and circumstances of each particular case, including the severity of the crime at issue,

17  whether the suspect poses an immediate threat to the safety of the officers or others, and whether

18  he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396

19  (internal quotations and citation omitted).  "[T]he reasonableness of force used is ordinarily a

20  question of fact for the jury."  *Liston*, 120 F.3d at 976 n.10.  In this regard, "[b]ecause the

21  excessive force inquiry nearly always requires a jury to sift through disputed factual contentions,

22  and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary

23  judgment or judgment as a matter of law in excessive force cases should be granted sparingly."

24  *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted); *see also Green v.*

25  *City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) ("Because this inquiry is

26  inherently fact specific, the 'determination whether the force used to effect an arrest was

27  reasonable under the Fourth Amendment should only be taken from the jury in rare cases.'"

28  (citation omitted)).

Here, in considering plaintiff's motion for summary judgment as to his Fourth Amendment claim, each stage of the analysis must be undertaken while viewing the facts in a light most favorable to the defendants as the non-moving party.

### 1. Nature of the Intrusion

Under the *Graham* analysis, the first step is to "assess the quantum of force used to arrest [plaintiff] by considering 'the type and amount of force inflicted.'" *Drummond ex rel. Drummond*, 343 F.3d at 1056 (quoting *Deorle*, 272 F.3d at 1279). "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9).

Here, it is undisputed that Ramar used deadly force when he shot plaintiff multiple times, firing three separate volleys of shots at him. (*See* Doc. No. 36 at 10:20–23) (defendants apparently concede that Ramar used deadly force against plaintiff)[11]; *see also Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) (*en banc*) (defining deadly force as force that "creates a substantial risk of causing death or serious bodily injury").

### 2. Governmental Interests

Having identified the quantum of force at issue, the court must balance the use of that force against the need for such force. *See Glenn*, 673 F.3d at 871; *Bryan*, 630 F.3d at 823; *Liston*, 120 F.3d at 976. Thus, the next step of the inquiry requires identification of the government's countervailing interests at stake. *Graham*, 490 U.S. at 396. "Relevant factors to this inquiry include, but are not limited to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th

---

[11] The court says apparently, because in addressing this point in their opposition, defendants state: "Here, the officers used deadly force when they shot and killed Abel." (Doc. No. 36 at 10:20–21.) Obviously, there is no individual named Abel involved in this case and although plaintiff Perkins was shot several times, he fortunately survived this shooting.

Cir. 2007) (quoting *Graham*, 490 U.S. at 396); *see also Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016); *Glenn*, 673 F.3d at 872; *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc); *Deorle*, 272 F.3d at 1280.  The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others.  *Vos*, 892 F.3d at 1031–32.

The *Graham* factors, however, are not exhaustive.  *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013).  Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos*, 661 F.3d at 441, courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  "Other relevant factors include the availability of less intrusive alternatives to the force employed" and "whether proper warnings were given[.]"  *Glenn*, 673 F.3d at 872; *see also Deorle*, 272 F.3d at 1283–84 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.").  Ultimately, the court must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*."  *Hughes v. Kisela*, 862 F.3d 775, 779 (9th Cir. 2016) (internal quotations and citation omitted), *rev'd on other grounds*, ___U.S.____, 138 S. Ct. 1148 (2018); *Mattos*, 661 F.3d at 441.

Finally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396 (citation omitted).  This is because, where appropriate, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

### a.  Severity of the Crime

Here, the evidence on summary judgment, viewed in a light most favorable to defendants, establishes that plaintiff was suspected of having committed a severe crime.  According to Ramar,


1    he was provided information that plaintiff was wanted for brandishing a firearm at, or assaulting,

2    a police officer with a firearm.  (Doc. No. 36-1, Ex. A ¶ 4.)  Assaulting a police officer with a

3    firearm is a felony under California law.  *See* Cal. Penal Code § 417(c); *see also* Cal. Penal Code

4    § 17(a) (defining felony offenses under California law).  The government has an undeniable

5    legitimate interest in apprehending felony criminal suspects.  *Miller v. Clark Cty.*, 340 F.3d 959,

6    964 (9th Cir. 2003).  Accordingly, a reasonable finder of fact could conclude based upon the

7    evidence before this court on summary judgment that the severity of the suspected crime placed a

8    "strong" government interest at stake.  *See id.*[12]

9                               *b.   Immediate Threat*

10           Next, the court turns to the issue of whether plaintiff posed an immediate threat to the

11   safety of officers Ramar, Olson, or others during this encounter.[13]  "Law enforcement officials

12   may not [use deadly force against] suspects who do not pose an immediate threat to their safety or

13   to the safety of others simply because they are armed."  *Roderick*, 126 F.3d at 1204.  However,

14   officers need not "delay their fire until a suspect turns his weapon on them."  *George*, 736 F.3d at

15   838 (affirming denial of defendants' summary judgment motion on qualified immunity grounds).

16   "If the person is armed–or reasonably suspected of being armed–a furtive movement, harrowing

17   gesture, or serious verbal threat might create an immediate threat."  *Id.* (involving a suspect that

18   did not "point[] his gun" at the officers or take "other actions that would have been objectively

19   threatening").

20   /////

---

21   [12]  There was another outstanding warrant for plaintiff's arrest, unrelated to the warrant for

22   brandishing of a firearm at a law enforcement officer.  (Doc. No. 36-2 ¶ 8.)  Defendants do not
     contend Ramar knew what suspected crime(s) that other warrant related to before he approached

23   plaintiff.  *See S.R. Nehad*, 929 F.3d at 1132 ("Only information known to the officer at the time
     the conduct occurred is relevant.").  Accordingly, the fact that there was another outstanding

24   warrant for plaintiff's arrest is irrelevant for purposes of resolving the pending motion.

25   [13]  Plaintiff urges the court to analyze this use of force by breaking the analysis into the individual

26   volleys fired by Ramar (i.e., first, second, and third volley), as opposed to assessing the entire
     incident holistically.  (Doc. No. 34-1 at 13 n.3.)  As detailed below, even analyzing each volley

27   separately, resolution of this motion is the same: plaintiff is not entitled to summary judgment in
     his favor because a trier of fact must determine whether the defendants' version of the facts

28   (specifically, what they saw) are credible and whether the force used was reasonably employed.

*First Volley.*  Prior to firing the first volley of shots, Ramar had information suggesting plaintiff had previously assaulted a police officer with a firearm and Ramar also knew that dispatch had specifically warned that plaintiff was armed and considered dangerous.  (Doc. No. 36-1, Ex. A ¶ 4.)  As Ramar approached plaintiff's vehicle in the parking lot, he noticed that the driver's-side window was down and shouted at plaintiff to show his hands.  (*Id.* ¶ 11.)  Ramar contends he saw plaintiff looking back and forth at Ramar "frantically."[14]  (Doc. No. 34-4 at 5.)  As Ramar got closer to plaintiff, Ramar saw plaintiff reaching in the compartment area of his vehicle.  (Doc. No. 36-1, Ex. A ¶ 11.)  Plaintiff failed to comply with Ramar's commands to show his hands and instead turned towards the center console of the vehicle.  (*Id.* ¶ 12.)  Ramar believed he saw a gun in plaintiff's right hand.  (*Id.*)

In short, viewing the facts in a light most favorable to defendants, Ramar saw plaintiff holding a gun and make at least one threatening movement or gesture.  *See Roderick*, 126 F.3d at 1204; *George*, 736 F.3d at 838.  The court recognizes that it is now undisputed that plaintiff was unarmed at the time of the shooting, and there is no evidence of any object found in the car that could have been mistaken for a gun.  Nonetheless, whether Ramar reasonably believed plaintiff was holding a gun and made any threatening movements is a question of fact for a jury to decide.  *See S.R. Nehad*, 929 F.3d at 1134 (holding that whether the officer "reasonably mistook the pen for a knife" and whether the suspect made any threatening movements were triable questions of fact).  While the video may prove to be persuasive evidence on these points, it is not so complete as to be dispositive.  Based upon all the evidence before the court on summary judgment, a jury

/////

/////

/////

/////

/////

---

[14]  Although defendants did not cite to this fact in support of their opposition, the court may rely on the entire record to consider additional facts not cited by a party.  Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

1   could conclude that plaintiff posed an immediate threat to Ramar, Olson, or others nearby prior to

2   the firing of the first volley of shots.[15]

3          *Second Volley.*   Seconds after the first volley, Ramar approached the vehicle as it sat on

4   top of the bark-landscaped island to assess whether plaintiff still posed a threat to the officers.

5   (Doc. No. 36-1, Ex. A ¶ 13.)  After Ramar yelled his second set of commands at plaintiff to show

6   his hands, plaintiff raised his right hand, which was visibly empty.  (Doc. No. 36-2 ¶ 36.)  This is

7   relevant because Ramar asserts that he saw a gun in plaintiff's right hand prior to the first volley.

8   (Doc. No. 36-1, Ex. A ¶ 12.)  On this basis, plaintiff argues that he was surrendering and that

9   Ramar therefore had no basis to shoot him.  (Doc. No. 34-1 at 13:25–14:6.)  Although it is

10   undisputed that plaintiff did *actually* raise his empty right hand prior to the second volley of shots

11   being fired, the parties do not agree that *Ramar accurately perceived that* plaintiff raised his

12   empty right hand.  In his declaration, Ramar asserts that he was unable to see plaintiff's "two

13   hands" prior to firing the second volley.  (*See id.* ¶ 13.)  The body camera footage clearly shows

14   plaintiff raising at least one hand towards the driver's-side window.  (Olson Bodycam at

15   17:45:37.)  Though the video is from Olson's perspective, Ramar appears to be several feet away

16   from the driver's-side door and to be looking at the driver-side window as he shoots through that

17   window.  (*Id.*)  Thus, it cannot be said that the video blatantly contradicts Ramar's account of

18   what he saw, even if it may well provide fodder for effective cross-examination of Ramar at trial.

19   *See Vos*, 892 F.3d at 1028 (explaining that courts should not accept facts that are "blatantly

20   contradicted by the video evidence").  Thus, construing the evidence on summary judgment in

21   favor of defendants, a fact-finder could determine that Ramar's claim that he only saw plaintiff

22

23   [15]  After briefing was complete, plaintiff alerted the court to the recent decision in *Orn v. City of*

24   *Tacoma*, 949 F.3d 1167 (9th Cir. Feb. 3, 2020), without explaining its relevance to resolution of
the pending motion.  (Doc. No. 53)  In *Orn*, the Ninth Circuit affirmed the denial of the

25   defendant's motion for summary judgment on qualified immunity grounds in a case involving the
use of deadly force.  There, an officer shot at a fleeing vehicle because he perceived the vehicle as

26   trying to run over himself and possibly others.  *Id.* at 1173.  As the Ninth Circuit noted, the officer
"had no reason to believe that [the suspect] had a firearm, and in fact he did not."  *Id.* at 1172.

27   The decision in *Orn*, has no apparent application here since Ramar argues that his fear for his
safety was due to plaintiff, who he argues he reasonably suspected was armed, not due to any fear

28   of being hit by plaintiff's vehicle.

1  raise his left hand, i.e., <u>not</u> the hand Ramar thought held a gun, to be credible.  *See Roderick*, 126

2  F.3d at 1204.

3       For the second volley of shots to be a justified use of force, however, it is not enough that

4  plaintiff did not follow Ramar's command to show his hands.  Rather, Ramar still would have

5  needed to see plaintiff make some sort of threatening movement prior to firing that second volley.

6  *See George*, 736 F.3d at 838.  Ramar's declaration provides no facts suggesting such a threat, and

7  his subjective fear that he would be shot, by itself, is insufficient.  (Doc. No. 36-1, Ex. A ¶ 13.)

8  *See Deorle*, 272 F.3d at 1281 (reversing the denial of defendants' summary judgment motion:

9  "[A] simple statement by an officer that he fears for his safety or the safety of others is not

10  enough; there must be objective factors to justify such a concern.").  However, during his

11  interview conducted by ISD the day after the shooting, Ramar asserted that, prior to his firing of

12  the second volley, he saw plaintiff reaching towards the floor of his vehicle.  (Doc. No. 34-4 at

13  6.)[16]  Plaintiff argues that his left arm was disabled by this time as a result of being hit by the first

14  volley and, therefore, he could not have made any threatening movements with it.  (Doc. No. 34-1

15  at 14:8–10.)  Nonetheless, there exists on summary judgment a factual dispute as to whether

16  plaintiff made any movement that could have been perceived as threatening, prior to the launch of

17  the second volley of shots, with whatever hand he had not raised.  Construing all evidence in a

18  light most favorable to defendants, a jury could reasonably conclude that plaintiff posed an

19  immediate threat prior to the second volley.

20       *Third Volley.*  Moments after firing the second volley, Ramar again demanded to see

21  plaintiff's hands and yelled: "Show your hands!  Show your hands!"  (Doc. No. 36-2 ¶ 39.)  At

22  this point in the encounter, the body camera video shows that plaintiff was not raising either of

23  his hands.  (Olson Bodycam at 17:45:39–42.)  Ramar asserts that plaintiff then "turned towards

24  the center console and was moving his body."  (Doc. No. 36-1, Ex. A ¶ 14.)  Plaintiff contends

25  that his "body slumped to the right side."  (Doc. No. 34-2 ¶ 33.)  On this basis, plaintiff again

26  argues that he was surrendering and Ramar therefore had no justification to fire the third volley of

27  _____

28  [16]  The court may consider facts in the record not cited by defendants.  Fed. R. Civ. P. 56(c)(3).

1  shots.  (Doc. No. 34-1 at 14:24–15:5.)  Whether plaintiff's movement could reasonably be

2  perceived as threatening, however, is a factual dispute that must be decided by a finder of fact.

3  Viewing the evidence in the light most favorable to defendants, Ramar could have believed that

4  plaintiff was still armed and had neither disarmed himself or been disarmed prior to Ramar's

5  firing the third volley of shots.  *See Roderick*, 126 F.3d at 1204; *George*, 736 F.3d at 838.[17]

6       In short, drawing all reasonable inferences in favor of defendants, a jury could reasonably

7  conclude that plaintiff posed an immediate threat to Ramar prior to each volley.  For the same

8  reasons, a reasonable jury could also conclude that plaintiff posed an immediate threat to Ramar

9  throughout the entire incident.

10                               *c.  Active Resistance or Flight*

11       Plaintiff's argument that flight alone does not justify the use of deadly force is irrelevant

12  for the purposes of resolving the pending motion for summary judgment.  The court has already

13  determined above that a jury could reasonably find plaintiff posed an immediate threat based on

14  Ramar's belief plaintiff was armed and made furtive movements.  Therefore, this is not a case

15  where the suspect poses no immediate threat and the officer attempts to justify the use of deadly

16  force based on his flight alone.  *See Roderick*, 126 F.3d at 1201 ("Where the suspect poses no

17  immediate threat to the officer and no threat to others, the harm from failing to apprehend him

18  does not justify the use of deadly force to do so." (quoting *Garner* 471 U.S. at 11)).  Additionally,

19  this case is not truly a flight case, since it is undisputed that Ramar fired the first volley of shots

20  almost at the same time that plaintiff's vehicle began to move in reverse.

21       Additionally, defendants argue that plaintiff resisted arrest before the second and third

22  volleys because plaintiff "refused to listen and comply with the commands of the officers."  (Doc.

23  No. 36 at 16:9–10.)  Plaintiff argues that he could not have resisted arrest after the first volley was

24  fired because he was wounded, citing Ramar's statement to ISD that Ramar believed plaintiff's

25  arm may have been paralyzed.  (Doc. No. 37 at 6:21–7:3.)  But Ramar asserts that he only made

26  that observation after the third volley of shots was fired.  (Doc. No. 34-4 at 6.)  Therefore,

27   

---

28  [17] Of course, a reasonable jury could also determine that Ramar never saw anything that could
have reasonably caused him to believe that plaintiff was armed at any time during the encounter.

1   whether plaintiff's failure to comply with the commands was voluntary (i.e., resisting arrest) or

2   involuntary (i.e., wounded) is a factual dispute for a jury to resolve.  Further, whether Ramar

3   should have observed that plaintiff was wounded earlier, and therefore concluded that plaintiff

4   could not raise his arms, is a factor that goes to the reasonableness of Ramar's conduct.  Viewing

5   the facts most favorably to defendants, a jury could find that plaintiff resisted arrest prior to the

6   second and third volleys.

7                    *d.  Other Factors*

8          The court finds that consideration of other relevant factors do not compel granting of

9   summary judgment in plaintiff's favor.  As noted above, in determining whether the force was

10  reasonable, courts consider "whether officers gave a warning before employing the force" at

11  issue.  *Glenn*, 673 F.3d at 876.  Here, Ramar instructed plaintiff to raise his hands prior to each of

12  the volleys while pointing his gun at plaintiff.  (Doc. No. 36-2 ¶¶ 25, 35, 39.)  Prior to the first

13  volley, Ramar also warned plaintiff that he would shoot him if he failed to comply.  (Doc. No. 36-

14  2 ¶ 25.)

15         Second, plaintiff argues that Ramar's failure to comply with two MPD policies should be

16  considered in evaluating the reasonableness of his conduct.  While "not dispositive," courts "may

17  consider a police department's own guidelines when evaluating whether a particular use of force

18  is constitutionally unreasonable."  *Drummond ex rel. Drummond*, 343 F.3d at 1059.  Ramar

19  violated MPD policy by failing to turn on his PVRS before approaching plaintiff in the Bank of

20  America parking lot.  (Doc. No. 36-2 ¶¶ 11, 12, 13.)  However, unlike the case in *Drummond ex*

21  *rel. Drummond*, the policy violated here did not relate directly to the use of force.  *See* 343 F.3d at

22  1059 (involving officers who "pressed their weight against [the suspect's] torso and neck" in

23  violation of internal guidelines, which warned that "when one or more [officers] are kneeling on a

24  subject's back or neck to restrain him, compression asphyxia can result").  MPD's policy

25  regarding PVRS activation does not discuss the use of deadly force.  (*See* Doc. No. 34-7.)

26  Certainly, while an officer's failure to turn on his body camera prior to his shooting of a suspect

27  may be relevant evidence with respect to the officer's state of mind, it does not by itself establish

28  that the use of force was unreasonable.  *See Drummond ex rel. Drummond*, 343 F.3d at 1059.

It is also true that the MPD use-of-force policy discourages its officers to shoot at a moving vehicle or its occupants.  (Doc. No. 36-2 ¶ 47.)  However, that policy also contains an exception that allows officers to shoot at a moving vehicle or its occupants where "deadly force other than the vehicle is directed at the officers or others."  (*Id.*)  Here, defendants do contend that plaintiff's "vehicle may have been slightly moving for the first volley of shots" but they also concede that "the threat was not the car."  (Doc. No. 36 at 17:14–16.)  Defendants thereby invoke the exception to the MPD policy on the grounds that plaintiff himself was the threat to officer safety, not his vehicle.  In any event, any violation of this policy merely constitutes some evidence on summary judgment.  In the end, construing all the evidence facts in favor of defendants, plaintiff is not entitled to summary judgment in his favor on his excessive use of force claim.

Last, plaintiff argues that there were less intrusive means of force that could have been applied by Ramar against him and that judgment in his favor should therefore be granted.  However, it is well established that "[w]ith respect to the possibility of less intrusive force, officers need not employ the least intrusive means available[,] so long as they act within a range of reasonable conduct."  *Estate of Lopez ex rel. Lopez*, 871 F.3d at 1006 (quoting *Hughes*, 841 F.3d at 1085).  Once again, there is evidence before the court on summary judgment, in the form of statements and/or declaration, that Ramar believed he saw a gun in plaintiff's hand and that plaintiff made furtive movements consistent with a reach for a gun prior to Ramar unleashing each of the three volleys of shots.  Given this evidence, it cannot be said that no reasonable fact-finder could find in favor of defendants.  *See Roderick*, 126 F.3d at 1201 (explaining that officers may "shoot to kill" if "the suspect presents an immediate threat to the officers").  Accordingly, consideration of this factor also does not compel the granting of plaintiff's motion.

### 3.   Balancing Test

*Graham* requires a balancing to determine "whether the degree of force used was warranted by the governmental interest at stake."  *Deorle*, 272 F.3d at 1282.  The question in all cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting" the arresting officer.  *Graham*, 490 U.S. at 397.  "Determining

22

1    whether the force used to effect a particular seizure is reasonable under the Fourth Amendment

2    requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

3    Amendment interests against the countervailing governmental interests at stake." *Id.* at 396

4    (internal quotations and citations omitted).  As stated at the outset of this analysis, "'it is the need

5    for force which is at the heart of the Graham factors.'" *Liston*, 120 F.3d at 976 (quoting

6    *Alexander*, 29 F.3d at 1367); *see also Blankenhorn*, 485 F.3d at 480.  However, where inferences

7    must be drawn from disputed material facts, summary judgment in an excessive force case should

8    be denied.  *See Green*, 751 F.3d at 1049; *Avina*, 681 F.3d at 1130; *Liston*, 120 F.3d at 976 n.10.

9         Here, "the need for force" turns on at least two disputed material facts:  whether Ramar

10   reasonably believed that plaintiff was armed prior to Ramar's firing of the first volley of shots

11   and whether plaintiff made any threatening or furtive movements prior to each of the volley of

12   shots being fired.  These are issues that must be decided by a jury.  Because genuine disputes of

13   material fact exist as to "whether the degree of force used was warranted by the governmental

14   interest at stake," *Derole*, 272 F.3d at 1282, summary judgment in favor of plaintiff as to his

15   claim of excessive use of force in violation of his rights under the Fourth Amendment must be

16   denied.

17        **B.  Qualified Immunity**

18        Because there are disputed material facts as to whether Ramar violated plaintiff's rights

19   under the Fourth Amendment, the court need not address the second step of the qualified

20   immunity analysis.  *See Pearson*, 555 U.S. at 231.

21                                      **CONCLUSION**

22        For all of the reasons explained above, plaintiff's motion for summary judgment (Doc.

23   No. 34) is denied.

24   IT IS SO ORDERED.

25   Dated:  **June 17, 2020**

26                                      UNITED STATES DISTRICT JUDGE

27

28

23