1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JASON B. PERKINS,                     No.  1:19-cv-00126-NONE-EPG

12                    Plaintiff,

13        v.                               ORDER DENYING IN PART AND
                                           GRANTING IN PART DEFENDANTS'
14   CITY OF MODESTO, et al.,              MOTION FOR SUMMARY JUDGMENT
                                           AND GRANTING REQUEST TO CONSIDER
15                    Defendants.          NEW AUTHORITY

16                                         (Doc. Nos. 85 & 96)

17

18        Plaintiff Jason B. Perkins filed this civil rights action against defendants City of Modesto

19   (the "City"), Modesto Police Department ("MPD"), MPD Chief of Police Galen L. Carroll

20   ("Carroll") in his individual capacity, MPD officer Jerry J. Ramar ("Ramar") in his individual

21   capacity, and MPD officer Ryan Olson ("Olson") in his individual capacity, after plaintiff was

22   shot multiple times by defendant Ramar.  (Doc. No. 22.)  The complaint brings claims under both

23   the Fourth and Fourteenth Amendments to the United States Constitution, Article I § 13 of the

24   California Constitution, as well as various state law claims.  (*Id.*)  The court previously denied

25   plaintiff's motion for summary adjudication.  (Doc. No. 68.)

26        Now pending before the court is defendants' motion for summary judgment brought on

27   the grounds that defendant Ramar's and officer Olson's use of force was reasonable under the

28   Fourth Amendment; Olson's conduct did not amount to integral participation in the alleged

                                          1

1   deprivation of plaintiff's rights; defendant Ramar is entitled to qualified immunity; the City and

2   MPD are not liable under *Monell v. Department of Social Services of the City of New York*, 436

3   U.S. 658 (1978), and its progeny; and defendants did not violate any state law.  (Doc. No. 85 at

4   2.)  For the reasons explained below, defendants' motion for summary judgment will be denied in

5   part and granted in part.[1]

6                                    **BACKGROUND**

7          The background set forth below is drawn from the following:  defendants' statement of

8   material facts and plaintiff's responses (Doc. No. 93-2 (Defendants' Statement of Material Facts

9   and Plaintiff's Responses, "DSF")); plaintiff's statement of material facts and defendants'

10   responses (Doc. No. 95-2 (Plaintiff's Statement of Material Facts and Defendants' Responses,

11   "PSF")); the exhibits cited by each statement, including and particularly the video recording from

12   the body camera worn by officer Olson capturing the shooting of plaintiff (*See* Pl.'s Ex. ("PX") 9

13   (Body Camera Footage of Officer Ryan Olson, "Body Camera"));[2] and filings on the docket in

14   this action.  To the extent either party has objected on evidentiary grounds to the opposing party's

15   materials, the court has relied on such materials only to the extent they are relevant and

16   admissible.

17   /////

18

---

19   [1]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's

20   overwhelming caseload has been well publicized and the long-standing lack of judicial resources
     in this district long-ago reached crisis proportion.  That situation, which continued unabated for

21   over twenty-two months but has now been partially addressed by the U.S. Senate's confirmation
     of a new district judge for this court on December 17, 2021, left the undersigned presiding over

22   1,300 civil cases and criminal matters involving 735 defendants at last count.  Unfortunately, that
     situation sometimes results in the court not being able to issue orders in submitted civil matters

23   within an acceptable period of time.  This situation has been frustrating to the court, which fully
     realizes how incredibly frustrating it is to the parties and their counsel.

24

25   [2]  Plaintiff objects to various statements on the grounds that they are unsupported by any material
     on the court's electronic filing system docket.  (*See, e.g.*, DSF at ¶ 1.)  Defendants do not explain

26   why they did not file documentary exhibits, including either officers' declarations, on the court's
     electronic filing system, in contravention of this court's Local Rules.  (*See* Doc. No. 95-1

27   *passim*.)  Defendants are admonished for their failure to comply with the local rules.  *See* E.D.
     Cal. R. 133(a).  Defendants are directed to file all exhibits as required by Local Rules 133 and

28   138 within fourteen (14) days of the date of this order.

1   The court notes that defendants were previously found to have spoliated prejudicial

2   evidence and that plaintiff has requested the imposition of sanctions in that regard.  (Doc. Nos.

3   44, 57.)  As relevant here, the assigned magistrate judge concluded as follows:  after plaintiff filed

4   a citizen's complaint and this lawsuit, defendant Ramar resigned from the MPD.  (Doc. No. 57 at

5   24–26.)  At that time, defendants erased all contents of Ramar's MPD-issued cell phone even

6   though they knew or should have known of the need to preserve that evidence.  (*Id.* at 26–27.)

7   The magistrate judge, who reviewed defendants' conduct both after this lawsuit was filed and

8   then after plaintiff made discovery requests for electronically stored information, concluded that a

9   presumption of prejudice was appropriate and left to the assigned district judge to decide the

10   appropriate sanctions to be imposed.  (*Id.* at 22–27.)  The court finds that it can resolve

11   defendants' pending motion without determining the appropriate sanctions to be imposed against

12   defendants at this time.

13   **A.      The Shooting**

14   Defendant Ramar and officer Olson were employed by the MPD on the day of the

15   shooting, November 6, 2017.  That day, they received a dispatch to be on the lookout for a

16   suspect—plaintiff—who was reportedly "wanted for a 417 on a TPD officer'[3] and potentially

17   'armed and dangerous.'"  (PSF at ¶ 2.)[4]  The officers were informed that plaintiff was in a black

18   Infiniti G35 vehicle at a Bank of America parking lot.  (DSF at ¶ 17.)  When the two officers

19   arrived there by motorcycle, they parked well behind plaintiff's vehicle.  (Body Camera

20   17:45:19–20.)  Plaintiff was alone in the front seat of the car.  (DSF at ¶ 22.)  Olson activated his

21   body camera, but Ramar, in violation of MPD policy, did not.  (*Id.* at ¶ 27.)

22   Once defendant Ramar and officer Olson met at the parking lot, Ramar got off his

23   motorcycle, drew his firearm, and jogged to plaintiff's car.  (Body Camera 17:45:21–26.)  As he

24

---

25   [3]  California Penal Code § 417(c) generally criminalizes drawing or exhibiting a firearm in the
immediate presence of a police officer in a rude, angry or threatening manner, if the offender acts

26   with the requisite mental state.  Defendants have provided a detailed description of plaintiff's
alleged criminal history, which the court has reviewed.  (*See* DSF ¶¶ 1–12.)

27

28   [4]  Defendants assert that dispatch stated the suspect was "wanted for brandishing or assault with a
firearm" but plaintiff disputes that this level of detail was provided by dispatch.

approached the driver's-side window, Ramar yelled, "Show me your hands, show me your hands! I'm going to shoot you!"  (*Id.* at 17:45:27–30.)  Plaintiff was in the driver's seat, with his left hand pressing a button to roll up his window and his right hand on the steering wheel, which was visible to both officers.  (PSF at ¶¶ 11, 12.)  Within one second of issuing his directive, Ramar shot twice into plaintiff's car ("first volley").  (Body Camera at 17:45:30.)  The first volley hit plaintiff and shattered his car window.  (PSF at ¶ 14.)

After the first volley, plaintiff's car traveled "several yards" in reverse, hit an island within the parking lot, and came to a stop.  (DSF ¶ 38; Body Camera 17:45:30–36.)  Neither defendant was in the car's path when it moved in reverse, since they were both to the car's side.  (*Id.*)  According to plaintiff, the first volley "disabled" him "and caused him involuntarily to depress the vehicle's gas pedal."  (PSF at ¶ 16.)[5]  This appears to be some degree of supposition; plaintiff testified at his deposition that he did not remember putting the car in reverse because he does not remember much after he pulled into the parking lot.  (Defs.' Ex. ("DX") G, 138:6–8, 139:1–2.)

The officers moved again toward the car.  Officer Olson and defendant Ramar positioned themselves next to plaintiff's broken driver-side window.  Ramar was positioned in front of the window such that he would have been able to see at least part of the front of plaintiff's body.  Olson, and thus his body camera, was positioned slightly behind the door and could see less of plaintiff's body.  (*Id.* 17:45:30–38.)  Ramar then shouted "let me see your hands!" twice.  (*Id.* 17:45:36–38.)  It is undisputed that plaintiff then raised his right hand, "which was visibly empty."  (PSF at ¶ 17.)  Plaintiff, who had just been shot, did not raise his left hand.  (Body Camera 17:45:36–43.)  Within two seconds of shouting his order, Ramar shot plaintiff again ("second volley").  (*Id.*)  Ramar did not warn plaintiff before firing the second volley.

Immediately after Ramar shot the second volley, plaintiff's body slumped to the right.  (PSF at ¶ 21.)  Defendant Ramar then yelled, "Show your hands!  Show your hands!"  (*Id.* at

---

[5] Although it is not clear from the video evidence before the court that the first volley *disabled* plaintiff or *caused* him to press the gas pedal, based on that video evidence, a reasonable jury could so conclude.

¶ 22.)  Plaintiff's left shoulder visibly twitched but he did not turn or show his hands.  (Body Camera 17:45:43–49.)  Ramar then shot plaintiff again without warning ("third volley").  (*Id.*)  It is undisputed that plaintiff sustained a total of six gunshot wounds, including to his jaw, chest, and left arm.  (PSF at ¶ 26.)

After Ramar fired the six shots, the officers stood next to plaintiff's window and pointed their firearms at him for approximately one minute.  (PSF ¶ 34; DSF ¶ 44.)  After additional officers arrived at the scene, officer Olson removed plaintiff from the vehicle.  (PSF ¶ 42.)  Plaintiff went face down onto the cement upon being removed from the car.  (Body Camera 17:48:10–16.)  Defendants argue he was "guided" down, and plaintiff argues his body "struck" the ground.  (PSF at ¶¶ 42–43.)  Based on the court's review of the video, viewing the facts in the required light, when plaintiff's body was pulled out of the car, much of his body hit the ground with force, and his head was lowered more slowly.  (Body Camera 17:48:10–16.)

**B.      After the Shooting**

On November 7, 2017, defendant Ramar was interviewed by MPD's Investigative Services Division ("ISD").  (*Id.* at ¶ 51.)  In that interview Ramar stated that:  (1) he believed that he saw a gun when plaintiff rolled up his window, and he had fired the first volley of shots when plaintiff "was still reversing" his vehicle; (2) Romar believed that he saw plaintiff "reaching towards his feet or towards the floorboard" before firing the second volley of shots; and (3) he believed that he saw "a movement like [plaintiff] was going down even further" before firing the third volley.  (PSF at ¶ 52.)

MPD maintains a use-of-force policy.  (DSF ¶ 52; DX A § 300.1 *et seq*.; PSF at ¶ 28.)  The parties dispute whether Ramar's use of force violated MPD policies.  (PSF at ¶ 29.)  However, it is undisputed by the parties that Chief Carroll "is a policy making official on behalf of" MPD.  (*Id.* at ¶ 53.)  On December 20, 2017, Carroll approved of defendant Ramar's 2017 performance evaluation, which concluded that Ramar's overall performance "Meets Expectations," although at least two pages were missing from that evaluation and thus it is unclear if the shooting of plaintiff was considered in evaluating Ramar's performance.  (*Id.* at ¶ 54.)  Plaintiff asserts that the failure to maintain a complete performance evaluation for Ramar

5

violates MPD policy which requires evaluations to be "kept on file."  (*Id.* at ¶ 55.)

On July 31, 2018, MPD Internal Affairs ("IA") issued a report regarding Ramar's shooting of plaintiff.  (*Id.* at ¶ 57; *see also* DX K (Declaration of Lieutenant Aaron Tait ("Tait Decl.").)  On December 17, 2018, MPD convened a "Shooting Review Board," of which Chief Carroll was a member, to review the shooting.  (PSF at ¶ 58.)  The Shooting Review Board concluded as follows:  (1) defendant Ramar "reasonably feared that [plaintiff] posed a threat of serious bodily harm or death" and (2) Ramar "fired his handgun to defend himself from a perceived immediate attack, including the fact that [plaintiff] did not comply with Ramar's initial commands, but instead immediately rolled up the tinted car window, in what Ramar could reasonably interpret as being an effort to conceal [plaintiff's] movements, and then failed to comply with subsequent commands while continuing to make movements consistent with Ramar's belief that [plaintiff] was trying to access a weapon."  (*Id.* at ¶ 59.)  Based on these findings, the Shooting Review Board found that the shooting of plaintiff by Ramar was "Within Policy."  (*Id.*)  On January 18, 2019, Carroll adopted and "approved" of the Shooting Review Board's disposition of the matter.  (*Id.* at ¶ 60.)  Carroll also approved a written reprimand against Ramar "for failing to activate his [body camera] during this incident;" however, no written reprimand was ever issued by MPD itself nor was one placed in Ramar's personnel file.  (*Id.* at ¶ 61.)

On June 28, 2018, plaintiff submitted a citizen complaint to MPD, pursuant to California Penal Code § 832.5, complaining that defendant Ramar's shooting of him amounted to excessive use of force.  (*Id.* at ¶ 62.)  On February 25, 2019, Ramar resigned from his employment with MPD, effective March 11, 2019, to accept a position with a different police department.  (*Id.* at ¶ 63.)  On May 8, 2019, MPD responded to plaintiff's June 28th citizen complaint, stating the complaint was closed due to Ramar's resignation from the MPD.  (*Id.* at ¶ 64.)  The parties agree that had the citizen complaint been resolved on the merits, MPD would have concluded that it was "unfounded" because the Shooting Review Board determined Ramar's actions were "within department policy." (*Id.* at ¶ 65.)  Plaintiff filed a subsequent citizen's complaint about MPD's spoliation of Ramar's cell phone.  (*Id.* at ¶ 69.)  There are either five or six possible dispositions

1  that could result from such complaints.  The parties agree that the March 24, 2020, plaintiff's

2  complaint was classified as "Other," but they dispute whether such a disposition was in

3  accordance with state law.  (*Id.* ¶¶ 69–71.)[6]

4  **C.    Defendant Ramar's Statements**

5         Defendant Ramar filed a declaration in support of his opposition to plaintiff's earlier

6  motion for summary adjudication, almost exactly two years after the shooting of plaintiff

7  occurred and about a year before he filed his declaration in support of the now pending  motion

8  for summary judgment.  (*See* Doc. No. 36-1 at 4–7.)  In his previous declaration filed in

9  November 2019, Ramar repeatedly asserted that the threat he perceived was from plaintiff

10 himself.  For instance, before he fired the first volley at plaintiff, Ramar declared that he "thought

11 [he] saw firearm in Plaintiff's right hand."  (*Id.* ¶ 12.)  In that 2019 declaration, defendant Ramar

12 never suggested that he perceived any threat from plaintiff's vehicle or that plaintiff somehow

13 posed a flight risk.  The only threat that Ramar previously identified as providing him with the

14 justification for his use of lethal force was his belief that plaintiff was reaching for a gun.  In his

15 second declaration (DX I, Declaration of Officer Jerry Ramar ("Ramar Decl.")), Ramar now

16 declares that he approached plaintiff's vehicle quickly because he was "in fear that the plaintiff

17 would be willing to assault officers or citizens in an attempt to evade arrest."  (*Id.* at ¶ 8.)

18 **D.    Expert Materials**

19        In connection with their pending motion for summary judgment, defendants have

20 submitted a report prepared by a use of force expert opining on the underlying shooting.  (DX F

21 (Expert Report of Steve Papenfuhs).)  In short, the defense expert states two opinions:  the

22 officers were responding to an emergency event, namely locating and arresting "a suspect with an

23 —————————————————

24 [6]  Plaintiff filed three relevant exhibits in opposition to defendants' pending motion for summary
    judgment.  Exhibit 37 lists five possible dispositions by MPD with respect to such citizen

25 complaints:  Unfounded, Exonerated, Not Sustained, Sustained, and Other.  (PX 37, at 431–34.)
    Exhibit 38 is a letter from internal affairs to Chief Carroll concerning plaintiff's complaint.  (PX

26 38.)  It also lists five possible dispositions, but instead of "Other" it lists "Closed."  (*Id.*)  Exhibit
    36 is a letter from Carroll to plaintiff's counsel stating that "the complaint has been deemed as

27 'Other'."  (PX 36.)  *See also* Cal. Penal Code § 832.7(d) (listing four dispositions for complaints:
    "sustained, not sustained, exonerated, or unfounded).  Although that statute has been amended

28 since plaintiff filed his complaint with the MPD, the relevant text has remained the same.

1   outstanding warrant for crimes of violence"; and defendant Ramar reasonably believed plaintiff

2   posed an "imminent and immediate threat to life."  (*Id.* at 10, 12.)

3        Defendant Ramar did not timely activate his body camera to allow his shooting of plaintiff

4   to be captured from his perspective.  In place of what would have been that potentially highly

5   relevant video evidence, defendants have submitted a video purportedly reconstructing the

6   incident from Ramar's perspective at the time he fired the second and third volleys (but not the

7   first volley).  (DX E ("Incident Reconstruction Video"); *see also* DX D (Expert Report of Jason

8   Fries).)  Utilizing laser scanning and 3D modeling, this Incident Reconstruction Video purports to

9   depict Ramar's line-of-sight which defendants argue shows that he did not have a clear view of

10  plaintiff's hands.[7]

11       In opposition to the pending motion for summary judgment, plaintiff has submitted a

12  report from an expert with 27 years of experience with the Los Angeles County Sheriff's

13  Department as a deputy sheriff, sergeant, and 15 years as a lieutenant.  (PX 3 (Expert Report of

14  Roger Clark) at 24.)  In his report, plaintiff's expert concludes that defendant Ramar's firing of all

15  three volleys of shots was unreasonable for a variety of reasons, including that plaintiff never

16  posed an imminent lethal threat to Ramar or anyone else.  (*Id.* at 21–22.)  Instead, expert Clark

17  concludes, Ramar "ran directly into the scene without making any tactical approach" and his

18  "abrupt shooting" was unnecessary and inappropriate.  (*Id.* at 21.)

19                              **LEGAL STANDARD**

20       Summary judgment is appropriate when the moving party "shows that there is no genuine

21  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

22  Civ. P. 56(a).  In summary judgment practice, the moving party "initially bears the burden of

23  proving the absence of a genuine issue *Celotex* of material fact."  *In re Oracle Corp. Sec. Litig.*,

24  627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

25  The moving party may accomplish this by citing to particular parts of materials in the record," or

26  by showing that such materials "do not establish the absence or presence of a genuine dispute, or

27  ――――――――――――――――――――

28  [7]  This may contradict the undisputed fact that "Plaintiff's right hand was on the steering wheel,
    which was visible to Defendants Ramar and Olson."  (PSF ¶ 11.)

1    that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

2    56(c)(1)(A), (B).  If the moving party meets its initial responsibility, the burden then shifts to the

3    opposing party to establish that a genuine issue as to any material fact actually does exist.  *See*

4    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to

5    establish the existence of this factual dispute, the opposing party is required to tender evidence of

6    specific facts in the form of affidavits, and/or admissible discovery material, in support of its

7    contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11;

8    *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider

9    admissible evidence in ruling on a motion for summary judgment.").  The opposing party must

10    demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the

11    suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W.*

12    *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

13    dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the

14    nonmoving party, *see Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

15         In the endeavor to establish the existence of a factual dispute, the opposing party need not

16    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

17    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

18    trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

19    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

20    *Matsushita*, 475 U.S. at 587 (citations omitted).

21         "In evaluating the evidence to determine whether there is a genuine issue of fact," the

22    court draws "all reasonable inferences supported by the evidence in favor of the non-moving

23    party."  *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the

24    opposing party's obligation to produce a factual predicate from which the inference may be

25    drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

26    *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Undisputed facts are taken as true for purposes of a

27    motion for summary judgment.  *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 745 (9th

28    Cir. 2010).  To demonstrate a genuine issue, the opposing party "must do more than simply show

1   that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a

2   whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

3   issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

4          Finally, where there is video evidence of the incident giving rise to the excessive use of

5   force claim, a court must "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S.

6   at 380–81.  Nonetheless, even when video evidence exists, the circumstances may be such that a

7   reasonable finder of fact could draw divergent conclusions from what the video evidence shows.

8   *See Nehad v. Browder*, 929 F.3d 1125, 1132–39 (9th Cir. 2019) (disputed issues of material fact

9   precluded summary judgment in an action alleging excessive use of force even though the

10  evidence included surveillance footage); *Glenn v. Washington Cnty.*, 673 F.3d 864, 878 (9th Cir.

11  2011) ("The circumstances of this case can be viewed in various ways, and a jury should have the

12  opportunity to assess the reasonableness of the force used after hearing all the evidence.").

## ANALYSIS

14          Defendants move for summary judgment and present their arguments in the following

15  order:  (A) neither officer used excessive force in violation of the Fourth Amendment;

16  (B) defendant Ramar is entitled to summary judgment in his favor on qualified immunity

17  grounds; (C) neither officer had a purpose to harm unrelated to a legitimate objective in violation

18  of the Fourteenth Amendment; (D) plaintiff's *Monell* claim against the City and MPD does not

19  survive summary judgment; (E) Chief Carroll is entitled to summary judgment as to plaintiff's

20  supervisory liability claim; (F) plaintiff's state-law claims fail to survive summary judgment

21  because they are redundant of his Fourth Amendment claim; (G) an award of punitive damages

22  are not warranted in this case as a matter of law; and (H) any claims brought against the so-called

23  "DOE Defendants" must be dismissed.  (*See* Doc. No. 85 at 4.)

24          Below, the court will first evaluate defendant Ramar's argument that he is entitled to

25  summary judgment on the ground of qualified immunity with respect to plaintiff's excessive use

26  of force claim and will then address defendants' other arguments in turn.

27  /////

28  /////

**A.**    **Qualified Immunity as to Plaintiff's Excessive Use of Force Claim Against Ramar**

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).  The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *accord Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *id.*); *see also City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015).  It is a defendants' burden to establish that they are entitled to qualified immunity. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

When presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts, taken in the light most favorable to the plaintiff, demonstrate that the defendants' conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established" at the time of the event in question.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *accord Pearson*, 555 U.S. at 236–42 (holding that courts need not analyze the two prongs in any particular order).  Below, the court will address the two prongs of the *Saucier* standard in order.

1.    Fourth Amendment Excessive Use of Force Standard

Title 42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by a person acting "under color of any statute, ordinance, regulation, custom, or usage."  *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).  To succeed on his § 1983 claim, plaintiff must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right.  *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  As the moving party, defendants here bear the */////*

11

1    initial burden on summary judgment of pointing out "an absence of evidence to support

2    [plaintiff's] case." *Celotex*, 477 U.S. at 325.

3        Under the Fourth Amendment, "[t]he right of the people to be secure in their persons,

4    houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

5    no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "The Fourth

6    Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those

7    which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see

8    also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the

9    Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force

10   or show of authority, in some way restrains the liberty of a citizen.").

11       A claim that a law enforcement officer used excessive force during an arrest is analyzed

12   under the Fourth Amendment's objective reasonableness standard.  *See Graham v. Connor*, 490

13   U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Under the standard, "the

14   question is whether the officers' actions are 'objectively reasonable' in light of the facts and

15   circumstances confronting them, without regard to their underlying intent or motivation."

16   *Graham*, 490 U.S. at 397.  Fundamental to "*Graham*'s objective-reasonableness test is the clear

17   principle that the force used to make an arrest must be balanced against the need for force:  it is

18   the need for force which is at the heart of the *Graham* factors." *Velazquez v. City of Long Beach*,

19   793 F.3d 1010, 1025 (9th Cir. 2015); *see also Liston v. County of Riverside*, 120 F.3d 965, 976

20   (9th Cir. 1997); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir.

21   2003).  Thus, in any such case, the court must balance "the nature of the harm and quality of the

22   intrusion on the individual's Fourth Amendment interests against the countervailing

23   governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010)

24   (quoting *Graham*, 490 U.S. at 396); *see also Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)

25   ("Force is excessive when it is greater than is reasonable under the circumstances."); *Liston*, 120

26   F.3d at 976.

27       This test "calls for a fact-intensive inquiry requiring attention to all circumstances

28   pertinent to the need for the force used." *Velazquez*, 793 F.3d at 1024.  This inquiry considers the

possibility that while officers might have been justified in using some force, the amount used might have been excessive. *Santos,* 287 F.3d at 853. In considering the pending motion for summary judgment, the following admonition of the Ninth Circuit with respect to summary judgment in cases involving claims of excessive use of force must be kept in mind:

> Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances. . . . Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."

*Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citations omitted); *see also Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) ("Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."); *see also Newmaker v. City of Fortuna*, 842 F.3d 1108, 1117 (9th Cir. 2016) ("Because this case requires a jury to sift through disputed factual contentions . . . summary judgment was inappropriate.").

> 2.      The Use of Force Employed in this Case

As noted above, the court must balance the governmental intrusion with the countervailing governmental interests at stake. First, this case concerns the use of deadly force. *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 n.9 (9th Cir. 2005) (defining "deadly force" as "force creating a substantial risk of causing death or serious bodily injury" (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th Cir. 2005) (*en banc*)). It is well established that

> The intrusiveness of a seizure by means of deadly force is unmatched. The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.

*A.K.H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (internal quotation marks and citations omitted). Accordingly, the use of "[d]eadly force is permissible only 'if the suspect threatens the officer with a weapon or there is probable cause to believe that

1  he has committed a crime involving the infliction or threatened infliction of serious physical

2  harm.'" *Id.* (quoting *Garner*, 471 U.S. at 11).

3        Having identified the quantum of force at issue here, the court must balance the use of that

4  force against the government's interest in its use.  *See Glenn*, 673 F.3d at 871; *Bryan*, 630 F.3d at

5  823; *Liston*, 120 F.3d at 976.  In analyzing the government's interests at issue, courts must

6  consider a number of factors, including (1) the severity of the crime, (2) whether the suspect

7  posed an immediate threat to the safety of the officers or others, and (3) whether the suspect

8  actively resisted arrest or attempted to evade arrest by flight, and any other exigent circumstances.

9  *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 605 (9th Cir. 2016); *Glenn*, 673 F.3d at 872;

10  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (*en banc*); *Deorle v. Rutherford*, 272 F.3d

11  1272, 1280 (9th Cir. 2001).  These *Graham* factors, however, are not exhaustive.  *George v.*

12  *Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013).  Because "there are no *per se* rules in the Fourth

13  Amendment excessive force context," *Mattos*, 661 F.3d at 441, courts are to "examine the totality

14  of the circumstances and consider 'whatever specific factors may be appropriate in a particular

15  case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*,

16  31 F.3d 873, 876 (9th Cir. 1994)).  "Other relevant factors include the availability of less intrusive

17  alternatives to the force employed" and "whether proper warnings were given[.]"  *Glenn*, 673

18  F.3d at 872.  Certainly an officer's failure to provide the suspect a warning that deadly force

19  would be employed "is a factor to be considered in applying the *Graham* balancing test."  *Deorle*,

20  272 F.3d at 1283–84.

21        Finally, "[t]he 'reasonableness' of a particular use of force must be judged from the

22  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

23  *Graham*, 490 U.S. at 396 (citation omitted).  This is because, where appropriate, "[t]he calculus

24  of reasonableness must embody allowance for the fact that police officers are often forced to

25  make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—

26  about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

27        Here, defendants argue that they are entitled to summary judgment with respect to

28  plaintiff's excessive use of force claim because of the strong governmental interest in detaining a

14

1    felony suspect with a no-bail warrant, given the threat plaintiff posed throughout his encounter

2    with police, plaintiff's attempts to evade the officers, and the purported warnings by defendant

3    Ramar given to plaintiff prior to the firing of each volley of shots.  (Doc. No. 85 at 19–23.)

4    Plaintiff counters that consideration of several factors precludes summary judgment as to Ramar's

5    firing of each volley of shots at plaintiff, arguing that the evidence on summary judgment

6    establishes that he did not pose an imminent and immediate threat to the officers at any point

7    during the incident and that a jury could reasonably conclude that Ramar's use of force was

8    unreasonable.  (Doc. No. 93 at 17–21.)

9            *a.  Immediate Threat*

10            In determining whether an officer's application of force was reasonable under the Fourth

11    Amendment, the "most important" governmental-interest factor "is whether the suspect posed an

12    immediate threat to the safety of the officer or others."  *Mattos*, 661 F.3d at 441 (cleaned up); *see*

13    *also Vos*, 892 F.3d at 1031–32 ("The most important factor, however, is whether [the suspect]

14    posed an immediate threat to the safety of officers or others."); *A. K. H.*, 837 F.3d at 1011; *Bryan*,

15    630 F.3d at 826; *Smith*, 394 F.3d at 702.  "In deadly force cases, where the suspect poses no

16    immediate threat to the officer and no threat to others, the harm resulting from failing to

17    apprehend him does not justify the use of deadly force to do so."  *Glenn v. Washington Cnty.*, 673

18    F.3d 864, 879 (9th Cir. 2011).  Similarly, "[a] desire to resolve quickly a potentially dangerous

19    situation is not the type of governmental interest that, standing alone, justifies the use of force that

20    may cause serious injury.  There must be other significant circumstances that warrant the use of

21    such a degree of force at the time it is used."  *Deorle*, 272 F.3d at 1281.  Thus, "[l]aw

22    enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an

23    immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat

24    of injury to person."  *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997).  Moreover, an

25    armed suspect is not inherently an immediate threat to the officers' or others' safety.  *Roderick*,

26    126 F.3d at 1204; *George*, 736 F.3d at 838 ("[T]he fact that the 'suspect was armed with a deadly

27    weapon' does not render the officers' response *per se* reasonable under the Fourth Amendment."

28    (quoting *Glenn*, 673 F.3d at 872–73)); *Deorle*, 272 F.3d at 1281 ("a simple statement by an officer

1    that he fears for his safety or the safety of others is not enough; there must be objective factors to

2    justify such a concern.").  At the same time, officers need not "delay their fire until a suspect

3    turns his weapon on them."  *George*, 736 F.3d at 838.  "If the person is armed—or reasonably

4    suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might

5    create an immediate threat."  *Id.*

6         Defendants argue that plaintiff posed an immediate threat prior to defendant Ramar firing

7    each of the three volleys of shots.  (Doc. No. 85 at 20–22.)[8]  Plaintiff disagrees and argues that it

8    was unreasonable for Ramar to claim a belief that plaintiff was armed throughout his encounter

9    with police.  (*See* Doc. No. 93 at 18–19.)

10        Here, viewing the evidence presented on summary judgment in a light most favorable to

11   plaintiff, the court finds several genuine disputes of material fact concerning the immediate-threat

12   factor.  The parties agree plaintiff was unarmed and nothing resembling a gun was recovered in

13   his vehicle.  (PSF ¶ 10.)  Thus, any belief to the contrary was incorrect.  "Where an officer's

14   particular use of force is based on a mistake of fact, we ask whether a reasonable officer would

15   have or *should* have accurately perceived that fact."  *Torres v. City of Madera*, 648 F.3d 1119,

16   1124 (9th Cir. 2011).  "[W]hether the mistake was an *honest* one is not the concern, only whether

17   it was a *reasonable* one."  *Id.* at 1127.

18        A jury could find Ramar's stated belief that plaintiff was armed to be unreasonable for

19   several reasons.  It is undisputed on summary judgment that when Ramar approached plaintiff,

20   "Plaintiff's right hand was on the steering wheel, which was visible to Defendants Ramar and

21   Olson."  (PSF at ¶ 11.)  A jury could conclude that Ramar's claimed belief that plaintiff's was

22   holding a firearm in plaintiff's right hand (Ramar Decl. at ¶ 13) was unreasonable, given that

23   plaintiff's right hand was visibly on the steering wheel of his vehicle.  Moreover, plaintiff's left

24   hand was pressing a button to roll up his window.  A jury could also conclude that plaintiff's act

25

---

26 [8] Defendants also move for summary judgment on plaintiff's excessive use of force the claim
brought against defendant Ramar to the extent that claim is premised on Ramar pointing his gun

27 at plaintiff prior to his firing of the first volley of shots.  (Doc. No. 85 at 20–21.)  Plaintiff does
not oppose defendants' motion for summary judgment on this basis.  (*See* Doc. No. 93.)
Accordingly, defendants' motion for summary judgment on plaintiff's excessive use of force

28 claim will be granted as to this limited aspect of the pending motion.

1   of rolling up the car window was inconsistent with any suggestion that he was about to somehow

2   use a weapon from inside of the vehicle.  In short, a reasonable jury could conclude from the

3   evidence that it is unreasonable to believe that someone rolling up a window is about to shoot out

4   of it.  In sum, a jury could conclude from the evidence that there was no reasonable basis to

5   believe plaintiff was armed.

6         If a jury concluded that Ramar had no reasonable basis to suspect that plaintiff was

7   armed—Ramar's rationale for why he believed plaintiff posed a threat—Ramar's use of deadly

8   force would be unreasonable as a matter of law.  *See Nehad*, 929 F.3d at 1132–33 ("The use of

9   deadly force is only reasonable if a suspect 'poses a *significant* threat of death or serious physical

10  injury to the officers or others.'" (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th

11  Cir. 2014))).

12        Alternatively, based on the Body Camera evidence alone, a reasonably jury could

13  conclude that, even if Ramar reasonably believed plaintiff had a weapon in the car, plaintiff did

14  not make any furtive movements—at least not any visible to defendant Ramar—that would justify

15  the use of deadly force in his firing of the second and third volley of shots.  *See George*, 736 F.3d

16  at 838.  Among other things, plaintiff had been shot in his left arm and on the left side of his body

17  before the second and third volleys were fired.  The Body Camera footage before the court on

18  summary judgment clearly shows plaintiff raising his right arm in what could reasonably be

19  interpreted as an attempt to surrender.  (Body Camera at 17:45:37.)  Based upon this evidence a

20  reasonable jury could disbelieve Ramar's claims that plaintiff made furtive movements with

21  either arm.  *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 710 (9th Cir. 2017) (there is a clearly

22  established right against being shot "while unarmed, surrounded by law enforcement, and in the

23  process of surrendering" and "it would be clear to a reasonable officer that his conduct was

24  unlawful in the situation he confronted." (citation omitted)).

25        Defendants now argue that the immediate threat was plaintiff's vehicle, not just plaintiff

26  himself.  (*See* Doc. No. 85 at 21–22.)  They cite to one paragraph in defendant Ramar's second

27  declaration in which he states that he was concerned about one patron in the parking lot who

28  could have gotten between Ramar and plaintiff and that Ramar therefore was "in fear that the

17

plaintiff would be willing to assault officers or citizens in an attempt to evade arrest." (Ramar Decl. at ¶ 8.)  However, viewed in a light most favorable to plaintiff, the Body Camera evidence presented on summary judgment is certainly arguably inconsistent with any assertion that plaintiff's vehicle posed a threat to anyone.  Plaintiff's vehicle was moving very slowly (if at all) when Ramar first shot plaintiff.  Moreover, plaintiff's car was at a complete stop when Ramar fired off the second and third volleys.  The Body Camera evidence establishes that Ramar and officer Olson were not in the path of plaintiff's car, nor does it appear from the video that Ramar was looking for or saw any citizens while he was shooting.  (*See* Body Camera at 17:45:28–17:45:45.)  Therefore, based on this evidence a reasonable jury could reject defendants' assertion that plaintiff's vehicle posed a danger to anyone when Ramar fired.  Moreover, based on applicable case law, it does not appear that plaintiff's vehicle posed the type of threat that would permit the use of deadly force in any event.  *See Orn v. City of Tacoma*, 949 F.3d 1167, 1180 (9th Cir. 2020) ("The cases upholding the use of deadly force to protect the public from a fleeing motorist have typically involved suspects who drove at extremely high speeds, endangered other motorists on the road, or intentionally targeted police officers with their vehicles.").

Finally, defendant Ramar's credibility may well be at issue in this case.  "Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt."  *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).  Although it is undisputed that plaintiff's right hand was on the visible steering wheel, Ramar declares that he thought he saw a firearm in plaintiff's right hand.  (PSF ¶ 11; Ramar Decl. ¶ 13.)  Moreover, the Body Camera evidence before the court does not clearly confirm critical aspects of Ramar's account of the events at issue.  Defendants object to many of plaintiff's statement of material facts on the grounds that, according to them, the Body Camera evidence is "unclear"— not because the video recording reinforces or supports Ramar's stated belief that plaintiff's actions posed a danger to Ramar or others.  (*See, e.g.*, PSF at ¶¶ 21–23.)  In addition, and as noted above, Ramar did not activate his body camera until after firing his sixth and final shot at plaintiff despite the fact that he had ample opportunity and reason to do so from the outset.  The Bank of America parking lot was Ramar's second location in searching for defendant—a man wanted for

1   assaulting a police officer and whom Ramar claims he believed was armed and dangerous.  A

2   reasonable jury could conclude that Ramar had ample time to activate his body camera before

3   getting to the parking lot or before approaching plaintiff.  A reasonable jury may doubt Ramar's

4   account of events on the basis that he had elected to violate MPD's body-camera policy.  *See*

5   *Drummond ex rel. Drummond*, 343 F.3d at 1059 (explaining that a failure to comply with

6   departmental policies may be indicative of the officer' state of mind at the time force was

7   applied).

8              *b.  Severity of Crime*

9          Defendants argue that consideration of the severity-of-the-crime factors weighs in favor of

10  granting their motion for summary judgment because the officers knew plaintiff had committed a

11  "417" on a police officer.  (PSF at ¶ 2.)  Assaulting a police officer with a firearm is a felony

12  offense under California law.  *See* Cal. Penal Code § 417(c).  Of course, the government has an

13  undeniable legitimate interest in apprehending felony criminal suspects.  *Miller v. Clark Cnty.*,

14  340 F.3d 959, 964 (9th Cir. 2003).  However, it does not follow that it was reasonable for Ramar

15  to shoot plaintiff six times simply because officers had a legitimate reason to apprehend him.

16         The Ninth Circuit has discussed the severity-of-the-crime factor in another case where

17  officers responded to the scene of a suspect who was wanted for a "417" and explained that this

18  factor is often used "as a proxy for the danger a suspect poses *at the time force is applied*."

19  *Nehad*, 929 F.3d at 1136 (emphasis added) (assuming the "417" was for a felony as opposed to

20  only a misdemeanor).  This is partly because, as noted above, "[a] desire to resolve quickly a

21  potentially dangerous situation is not the type of governmental interest that, standing alone,

22  justifies the use of force that may cause serious injury."  *Hughes v. Kisela*, 862 F.3d 775, 780 (9th

23  Cir. 2016) (cleaned up), *rev'd on other grounds sub nom*, ___ U.S. ___, 138 S. Ct. 1148 (2018);

24  (quoting *Deorle*, 272 F.3d at 1281); *see also George*, 736 F.3d at 838.  The Ninth Circuit has

25  applied this principle consistently, even in a case involving a suspect who had shot and killed a

26  federal agent a day prior.  *See Roderick*, 126 F.3d at 1203 ("[T]he fact that [the suspect] had

27  committed a violent crime in the immediate past is an important factor but it is not, without more,

28  a justification for killing him on sight."); *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d

1159, 1177 (9th Cir. 2013) ("[N]ot knowing whether a suspect is armed is not the same as having reason to believe the suspect is actually armed."); *Smith*, 394 F.3d at 702–03 (holding that the nature of the crime at issue "provid[ed] little, if any, basis" for the use of force where the suspect had physically assaulted his wife but was standing alone on his porch when the officers arrived).

Here, defendant Ramar's shooting of plaintiff cannot be justified based merely on the fact that police dispatch had reported a suspect wanted in connection with a "417" on a police officer at some time in the past. Regardless of police's legitimate justification in arresting plaintiff, they did not have open license to shoot him at the first opportunity to do so. Therefore, "[e]ven if [plaintiff] had made felonious threats or committed a serious crime prior to [Ramar's] arrival, he was indisputably not engaged in any such conduct when [Ramar] arrived, let alone when [Ramar] fired his weapon" at any point during the encounter. Nehad, 929 F.3d at 1136. Accordingly, consideration of the severity-of-the-crime factor does not weigh in favor of granting defendants' pending motion for summary judgment.

> c. *Resistance*

The final factor in evaluating the government interest at stake is whether the suspect was resisting arrest or attempting to evade arrest by flight. *See Diaz*, 840 F.3d at 605; *Deorle*, 272 F.3d at 1280. In this regard, the Ninth Circuit has "long distinguished between passive and active resistance[.]" *Rice v. Morehouse*, 989 F.3d 1112, 1124 (9th Cir. 2021). Generally, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) (finding mere passive resistance where a suspect failed to heed commands to exit his vehicle while "shouting gibberish and hitting himself"); *see also Smith*, 394 F.3d at 703 (finding passive resistance where a suspect "continually ignored" the officers' instructions to remove his hands from his pockets and not to enter his home). Furthermore, "even when a felony suspect tries to escape, 'where the suspect poses no immediate threat to the officer and no threat to others, the harm from failing to apprehend him does not justify the use of deadly force to do so.'" *Rodriguez*, 899 F.3d at 729 (quoting *Roderick*, 126 F.3d at 1201).

/////

20

1        In this case the parties dispute whether plaintiff actively resisted.  (*See* Doc. Nos. 85 at 22;

2   93 at 19.)  Plaintiff asserts that he was shot by the first volley prior to his vehicle moving in

3   reverse and that he was attempting to surrender when the second and third volley of shots were

4   fired by defendant Ramar.  (Doc. No. 93 at 19.)  Construing the evidence in a light most favorable

5   to plaintiff and ensuring that construction is consistent with the Body Camera video evidence

6   before the court on summary judgment, a jury could reasonably conclude that plaintiff did not

7   actively resist police during this encounter.  But even if a jury were to conclude that there was

8   some degree of active resistance on plaintiff's part prior to Ramar's firing of the first volley, that

9   by itself would be insufficient to find Ramar's use of force reasonable.  *See Garner*, 471 U.S. at

10  11 ("It is not better that all felony suspects die than that they escape."); *see also Roderick*, 126

11  F.3d at 1204 ("Other means exist for bringing the offender to justice, even if additional time and

12  effort are required.").  Accordingly, consideration of this factor also does not weigh in favor of

13  defendants for purposes of resolving the pending motion for summary judgment.

14       Having weighed all of the relevant factors and considered the evidence submitted by the

15  parties on summary judgment, the court finds that there are genuine disputes as to material issues

16  of fact that must be resolved by the finder of fact in determining whether defendant Ramar's use

17  of force was reasonable.

18              3.    Clearly Established

19       Having found that a triable issues of fact exist as to whether plaintiff's rights under the

20  Fourth Amendment were violated, the court turns to the second step of the qualified immunity

21  analysis:  whether plaintiff's right was clearly established at the time of the shooting.  "A

22  Government official's conduct violates clearly established law when, at the time of the challenged

23  conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would

24  have understood that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731,

25  741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987));

26  *see also Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018) ("Qualified immunity

27  attaches when an official's conduct does not violate clearly established statutory or constitutional

28  rights of which a reasonable person would have known." (quoting *White v. Pauly*, __ U.S. __, 137

21

S. Ct. 548, 551 (2017)); *Young*, 655 F.3d at 1167 ("[T]he relevant inquiry is whether the state of the law at the time of the official conduct complained of was such as to give the defendants fair warning that their conduct was unconstitutional—that a fair application of well-established legal principles would warrant such a conclusion."); *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry focuses on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional." (quoting *Saucier*, 533 U.S. at 202)). "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate." *City of Escondido v. Emmons*, __U.S.__, 139 S. Ct. 500, 504 (2019) (quoting *Kisela*, 138 S. Ct. at 1153)); *see also Mullenix*, 577 U.S. at 12; *A. K. H.*, 837 F.3d at 1013; *Vos*, 892 F.3d at 1035 (quoting *Ashcroft*, 563 U.S. at 740). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742). This inquiry must be undertaken in light of the specific context of the particular case, rather than as a broad general proposition. *Emmons*, 139 S. Ct. at 504; *Saucier*, 533 U.S. at 201.

Thus, "[i]n an 'obvious case,' the general standards established in *Garner* and *Graham* can suffice to put an officer on notice that his conduct is unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). In less obvious cases, there must be "precedent that holds 'certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" *Id.* (quoting *Saucier*, 533 U.S. at 202). Lower courts have been instructed in this regard, "not to define the right at issue at a high level of generality." *Id.*; *accord Kisela*, 138 S. Ct. at 1153. Additionally, "[t]he determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000). If "there is a material dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial[.]" *Id.*

In moving for summary judgment on qualified immunity grounds in this case, defendants characterize the shooting as follows: "Plaintiff's presence in public posed a lethal threat to the

officer who had the legal duty to arrest him and the public who may find themselves in danger of the next likely vehicle pursuit." (Doc. No. 85 at 25.) Citing the decision in *Brosseau*, 543 U.S. at 203–04, defendants contend that the Supreme Court has previously "held that qualified immunity applied after an officer shot a fleeing motorist with a no bail warrant in the back after he ignored commands to exit the vehicle." (Doc. No. 85 at 25.) Defendants then cite various out-of-circuit decisions for the general proposition that an officer may shoot a fleeing a motorist who is posing a risk to the safety of the public, the officers, or both. (*Id.* at 25–26.)

There are at least three problems with defendants' characterization of this shooting in light of the evidence before the court on summary judgment. First, defendant Ramar's statement about his vehicle-related rationale is largely belied by the evidence.[9] Second, plaintiff's vehicle came to a stop before Ramar fired the second and third volley of shots (Olson Decl. at ¶ 13), at which time, viewing the evidence in the light most favorable to plaintiff, plaintiff could reasonably be found to have been attempting to surrender to police. Finally, defendants' characterization of the events improperly draws all conceivable inferences from the evidence on summary judgment in their favor. Viewing the evidence in the proper light, the court must determine whether plaintiff had a clearly established right not to be shot six times in a slowly moving and/or parked vehicle while unarmed and, with respect to the second and third volleys, attempting to surrender.

The court concludes that, seen in this light, this is an "obvious" case in which the general standards set forth by the Supreme Court in *Garner* and *Graham*, as well as Ninth Circuit precedent, put defendant Ramar on notice that he could not use deadly force against plaintiff. First and foremost, there are triable issues of fact as to Ramar's belief about plaintiff being armed. A reasonable jury could conclude that the belief was unreasonable, or that Ramar never had such a belief in the first place. If a jury so concludes, the primary rationale—or the sole one if the jury

/////

/////

---

[9]  Indeed, defendants have presented no evidence indicating that Ramar or officer Olson knew anything other than that plaintiff was wanted for a "417" on a police officer and that he was considered possibly armed and dangerous.

23

disregards Ramar's late-offered explanation that he also feared plaintiff's vehicle[10]—Ramar would not be entitled to qualified immunity with respect to any of the shots he fired.  *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *Henrich*, 39 F.3d at 914 ("An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" (citation omitted)).  Indeed, plaintiff contends he was shot for no reason as he "posed no threat" to the officers or the public generally.  (*See* Doc. No. 93 at 18.)  If the jury accepts that view of the facts, then qualified immunity would not apply here. *Rodriguez*, 899 F.3d at 733 ("Any reasonable officer would have known, even without a judicial decision to tell him so, that it was unlawful to kill someone—anyone—for no reason.").

Second, even if a jury concluded that defendant Ramar reasonably believed plaintiff was armed, using deadly force against someone simply because they are armed, with no other evidence of imminently threatening behavior, violates clearly established law.  *See George*, 736 F.3d at 838-39 (Requiring an armed suspect to make some furtive or otherwise threatening movement, stating "the fact that the suspect was armed with a deadly weapon does *not* render the officers' response [of using deadly force] *per se* reasonable under the Fourth Amendment." (cleaned up)); *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) (same); *Roderick*, 126 F.3d at 1204 ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").  This would be true with respect to any of the three volleys fired by Ramar, including the first volley which was fired at the time plaintiff purportedly was attempting to flee—*i.e.*, his vehicle started to slowly move in reverse.  *See Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

/////

---

[10]  Defendants concede that this contention represents a late change in their position.  (Doc. No. 85 at n.78 ("In response to Plaintiff's motion for summary adjudication, Defendants prematurely suggested that 'the threat was not the car.'").)

1    Viewing the evidence on summary judgment in a light most favorable to plaintiff, that

2  plaintiff rolled up his car window immediately after Ramar shouted "show me your hands" did

3  not provide a reasonable basis for Ramar's firing of the first volley of shots.[11]  Additionally, and

4  in particular viewing the evidence in a light most favorable to plaintiff, it was clearly established

5  that Ramar could not fire the second volley and third volley of shots.  "[An individual]'s Fourth

6  Amendment right not to be shot [] while unarmed, surrounded by law enforcement, and in the

7  process of surrendering is clearly established such that [] 'it would be clear to a reasonable officer

8  that his conduct was unlawful in the situation he confronted.'"  *Longoria*, 873 F.3d at 710

9  (quoting *Hernandez v. Mesa*, ___ U.S. ___, 137 S. Ct. 2003, 2007 (2017))).  Here, if a jury were

10  to find that it was unreasonable to suspect that plaintiff was armed or had made any furtive

11  movements, but that he was instead attempting to surrender immediately before the second and

12  third volleys were fired, Ramar would not be entitled to qualified immunity.  *See, e.g.*, *Kaur v.*

13  *City of Lodi*, 263 F. Supp. 3d 947, 967 (E.D. Cal. 2017) ("[The suspect] was asked to stop.  A

14  jury could conclude that he did.");  *see also Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th

15  Cir. 2017) ("[T]erminating a threat doesn't necessarily mean terminating the suspect.  If the

16  suspect . . . appears wounded, he may no longer pose a threat; a reasonable officer would reassess

17  the situation rather than continue shooting.").

18    Finally, although there is no direct evidence before the court on summary judgment

19  suggesting that defendant Ramar himself perceived a threat from plaintiff's vehicle (as opposed to

20  from plaintiff possibly reaching for a weapon).  Even if such a threat could be inferred from the

21  evidence, Ramar still would not be entitled to qualified immunity.  "The right not to be shot in a

22  car that poses no immediate danger to police officers or others is clearly established."  *Losee v.*

23  *City of Chico*, 738 F. App'x 398, 400 (9th Cir. 2018);[12] *see also Acosta v. City & Cnty. of San*

24

_____

25  [11]  From the evidence before the court a reasonable jury could conclude that plaintiff was not
26  given time to process the directive or was confused by it, rather than doing anything that would
    justify the first volley of shots.  A jury must sift through this evidence and come to a
27  determination based on it.

28  [12]  Citation to this and any other unpublished Ninth Circuit opinions cited herein is appropriate
    pursuant to Ninth Circuit Rule 36-3(b).

1   *Francisco*, 83 F.3d 1143, 1148 (9th Cir. 1996) ("the law governing 'shooting to kill' a fleeing

2   suspect is clearly established" and "a reasonable officer could not have reasonably believed that

3   shooting at the driver of the slowly moving car was lawful"); *Villanueva v. California*, 968 F.3d

4   1158, 1172 (9th Cir. 2021) ("In light of *Acosta*, all reasonable officers would know it is

5   impermissible to shoot at a slow-moving car when he could simply step to the side to avoid

6   danger."); *Orn*, 949 F.3d at 1180 ("The cases upholding the use of deadly force to protect the

7   public from a fleeing motorist have typically involved suspects who drove at extremely high

8   speeds, endangered other motorists on the road, or intentionally targeted police officers with their

9   vehicles.").

10        Here, when defendant Ramar fired the first shots, plaintiff's car was hardly moving.

11   (Body Camera 17:45:30–31.)  For the second and third volleys, plaintiff's car was completely

12   stopped.  Thus, a reasonable jury could determine that plaintiff's car was not a threat whatsoever,

13   and in such situations, the Ninth Circuit had determined qualified immunity is inappropriate.  *See,*

14   *e.g., Acosta*, 83 F.3d at 1146 ("On the basis of the evidence presented at trial, the jury could have

15   reasonably concluded that a reasonable officer, who had positioned himself facing the driver so

16   that he was standing closer to the side than the dead-center of the car, would have recognized that

17   he could avoid being injured when the car moved slowly, by simply stepping to the side.").

18        In sum, viewing the facts in a light most favorable to plaintiff, Ramar's conduct would

19   squarely fall within the scope of existing caselaw establishing that use of deadly force amounts to

20   a constitutional violation.  Accordingly, Ramar is not entitled to summary judgment in his favor

21   on qualified immunity grounds.  *See LaLonde*, 204 F.3d at 953.[13]

22   /////

23   /////

24   [13]  The undersigned has previously endorsed the now widely-held view that the judicially created
qualified immunity doctrine should be completely re-examined, particularly in cases involving

25   the use of deadly force by law enforcement officers. *Ventura v. Rutledge*, 398 F. Supp. 3d 682,
697 n.6 (E.D. Cal. 2019) (granting defendant's motion for summary judgment on qualified

26   immunity grounds), *aff'd* 978 F.3d 1088 (9th Cir. 2020).  In any event, given the evidence on

27   summary judgment in this case and for the reasons explained above, binding precedent dictates
that the motion brought on qualified immunity grounds with respect to defendant Ramar be

28   denied.

1    **B.      Olson's Use of Force**

2              Defendants also move for summary judgement as to any excessive use of force claim

3    brought against officer Olson based upon plaintiff's allegation that Olson failed to intercede as

4    Ramar shot plaintiff several times.  (Doc. No. 85 at 23–24.)  Defendants have not moved for

5    summary-judgment as to plaintiff's claims based upon Olson's alleged post-shooting conduct (*see*

6    Doc. No. 93 at 23–24), and the court will therefore not grant summary judgment as to those

7    claims, to the extent they have been asserted (*see* Doc. No. 22, Compl., at ¶ 42 (in Fourth

8    Amendment claim against Olson, only discussing his alleged failure to intercede and integral

9    participation)).

10             However, with respect to the failure-to-intercede claim, the Ninth Circuit has suggested

11   that because there is no clear caselaw regarding when an officer is required to intervene, such

12   claims would always be barred by qualified immunity.  *Penaloza v. City of Rialto*, 836 F. App'x

13   547, 549-50 (9th Cir. 2020) ("Our precedent does not clearly establish when an officer has a

14   'realistic opportunity to intercede.'")  Because defendants have raised the affirmative defense of

15   qualified immunity in their answer (Doc. No. 24 at 23), the court will *sua sponte* direct the parties

16   to brief the issue.  *See Easley v. City of* Riverside, 890 F.3d 851, 955 (9th Cir. 2018), *rev'd on*

17   *other grounds on hearing en banc*, 765 F. App'x 282 (9th Cir. 2019).  Ruling on defendant's

18   motion for summary judgment will be deferred as to this issue only until supplemental briefing is

19   submitted by the parties pursuant to the instructions provided by the court below.

20   **C.      Excessive Use of Force Under the Fourteenth Amendment**

21             A plaintiff can prevail on a Fourteenth Amendment due process claim if a government

22   official's conduct "shocks the conscience."  *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir.

23   2010).  The "critical consideration [is] whether the circumstances are such that actual deliberation

24   is practical."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citation omitted).  If so, "an

25   officer's 'deliberate indifference' may suffice to shock the conscience," *Wilkinson*, 610 F.3d at

26   554, and the plaintiff may prevail by showing that the officer "disregarded a known or obvious

27   consequence of his action," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).[14]  The

28   ───────────────────

[14]  The standard differs if deliberation is impossible.  *Wilkinson*, 610 F.3d at 554.

1 "deliberate-indifference inquiry should go to the jury if any rational factfinder could find this

2 requisite mental state."  *Id.*

3       Here, the court concludes that triable issues of fact exist as to whether defendant Ramar

4 violated plaintiff's Fourteenth Amendment rights.  More specifically, a reasonable jury could

5 conclude from the evidence before the court on summary judgment that Ramar had sufficient

6 time to deliberate before approaching plaintiff.  If so, a jury could also reasonably conclude that

7 Ramar's conduct—shooting plaintiff six times in a slightly moving and/or parked vehicle while

8 he was unarmed and attempting to surrender (for four of those shots)—shocks the conscious.  *See*

9 *Nicholson*, 935 F.3d at 694 (holding that the deliberate indifference standard was satisfied under

10 the Fourteenth Amendment for purposes of summary judgment:  "As the district court explained,

11 in 'minimal information' situations, an officer must take some time to assess what is happening

12 before employing deadly force.  Holding otherwise would result in an 'intolerably high risk of a

13 tragic shooting that may otherwise have been avoided by proper deliberation whenever

14 practical.'").  Because plaintiff has not opposed summary judgment as to any other defendant (*see*

15 Doc. No. 93 *passim*) in this regard, summary judgment will be granted in favor of all defendants

16 other than Ramar as to this claim.

17 **D.**    *Monell* **Liability:  The City and MPD**

18       As a rule, "a municipality cannot be held liable under § 1983 solely because it employs a

19 tortfeasor . . . in other words, a municipality cannot be held liable under § 1983 on a *respondeat*

20 *superior* theory."  *Monell*, 436 U.S. at 691.  Under *Monell*, however, a municipality may be held

21 liable for injuries caused by the execution of its policy or custom or by those whose edicts or acts

22 represent official policy.  *Id.* at 694.  "To impose *Monell* liability on a municipality under Section

23 1983, plaintiff must prove: (1) [he or she] had a constitutional right of which he was deprived; (2)

24 the municipality had a policy; (3) the policy amounts to deliberate indifference to his

25 constitutional right; and (4) the policy is the moving force behind the constitutional violation."

26 *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (cleaned up); *see also Dougherty v.*

27 *City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).  Defendants have moved for summary

28 judgment in favor of defendants City of Modesto and MPD as to plaintiff's *Monell* claim.

1        1.        Deprivation of a Constitutional Right

2            For the reasons set forth above, plaintiff's Fourth Amendment excessive use of force and

3    Fourteenth Amendment due process claims against defendant Ramar will survive summary

4    judgment.  In addition, defendants have not moved for summary judgment as to plaintiff's claim

5    based on officer Olson's alleged use of force in removing plaintiff from his vehicle after he was

6    shot by Ramar.  Therefore, for purposes of summary judgment, plaintiff has satisfied the first

7    element of a *Monell* claim.

8        2.        Policy or Custom

9            A policy or custom may be shown under *Monell* by establishing the existence of:

10   (1) conduct pursuant to a formal or expressly adopted official policy; (2) a longstanding practice

11   or custom which constitutes the "standard operating procedure" of the local government entity;

12   (3) the decision of a decision-making official who was, as a matter of state law, a final

13   policymaking authority and whose edicts or acts may fairly be said to represent official policy in

14   the area of decision; or (4) that an official with final policymaking authority either delegated that

15   authority to, or ratified the decision of, a subordinate.  *See Thomas v. Cnty. of Riverside*, 763 F.3d

16   1167, 1170 (9th Cir. 2014); *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).

17           In opposing summary judgment, plaintiff argues that Chief Carroll and the MPD ratified

18   defendant Ramar's conduct.  (*See* Doc. No. 93 at 25–26.)  Specifically, plaintiff points to their

19   post-shooting statements and conduct, namely the lack of discipline imposed on Ramar following

20   an  allegedly deficient internal affairs investigation.  To establish *Monell* liability on a ratification

21   theory, a plaintiff must show that "a policymaker approve[d] a subordinate's decision and the

22   basis for it."  *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).[15]  Ratification must

23   involve "affirmative or deliberate conduct."  *Id.*  "A mere failure to overrule a subordinate's

24   actions, without more, is insufficient to support a § 1983 claim."  *Lytle v. Carl*, 382 F.3d 978, 987

25   (9th Cir. 2004); *see also Dasovich v. Contra Costa Cnty. Sheriff Dep't*, No. 14-CV-00258-MEJ,

26   2014 WL 4652118, at *6 (N.D. Cal. Sept. 17, 2014) (granting a motion to dismiss *Monell* claims

27   _____

28   [15]  Ratification requires that an "official policymaker" approve a subordinate's decision or action.
*Id.*  The parties agree that Chief Carroll is an official policymaker.  (PSF at ¶ 53.)

1   where the plaintiff did not plead facts demonstrating that the "policymaker [had] knowledge of

2   the constitutional violation and actually approve[d] of it," rather than merely failing to impose

3   discipline).

4        Following this general rule, courts have found that a supervisor concluding "that an

5   officer acted within policy does not alone amount to *Monell* ratification."  *Weishaar v. Cnty. of*

6   *Napa*, No. 14-cv-01352-LB, 2016 WL 7242122, at *14 (N.D. Cal. Dec. 15, 2016) (citing cases);

7   *accord Wolniak v. Cnty. of Sacramento*, No. 2:17-CV-01286 KJM AC, 2017 WL 6558095, at *4

8   (E.D. Cal. Dec. 22, 2017).  As the district court in *Weishaar* explained:  "[G]enerally, to hold a

9   government entity 'liable under section 1983 whenever policymakers fail to overrule the

10  unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior*

11  liability into section 1983,' thereby creating an 'end run around *Monell*.'"  *Weishaar*, 2016 WL

12  7242122, at *14 (quoting *Gillette*, 979 F.2d 1348).  "In other words, in order for there to be

13  [*Monell*] ratification, there must be 'something more' than a single failure to discipline or the fact

14  that the policymaker concluded that the defendant officer's actions were in keeping with the

15  applicable policies and procedures."  *Id*.  (quoting *Garcia v. City of Imperial*, No. 08cv2357

16  BTM(PCL), 2010 WL 3911457, at *2 (S.D. Cal. Oct. 4, 2010)); *see also Dorger v. City of Napa*,

17  No. 12-CV-440 YGR, 2012 WL 3791447, at *5 (N.D. Cal. Aug. 31, 2012) ("[W]hile failure to

18  reprimand, standing on its own, may not be sufficient to establish ratification, additional evidence

19  of agreement or acquiescence to the conduct will support a finding of ratification.").  "This

20  'something more' may be an 'obviously flawed investigation.'"  *Id*. (citing *Garcia*, 2010 WL

21  3911457, at *2).  "'Extreme factual situations' can also support ratification liability."  *Id*. (citing

22  *Garcia*, 2010 WL 3911457, at *2).

23       Caselaw, however, does not universally rule out ratification-based *Monell* claims

24  premised solely on an official policymaker's finding that a subordinate's conduct fell within

25  policy.  For example, in *Rosales v. City of Chico*, Civ. No. 2:14-02152 WBS, 2015 WL 6167740,

26  at *7 (E.D. Cal. Oct. 20, 2015), the district court denied the city's motion for summary judgment

27  on a *Monell* claim where the chief of police proclaimed that the officer's conduct at issue was "in

28  compliance with Department policy."  In so ruling, the district court stated:

> In this case, it is not a mere ratification, but rather the Chief of Police's pronouncement that [the defendant officer's] alleged use of force was "in compliance with Department policy" that gives rise to a *Monell* claim. This is "tantamount to the announcement or confirmation of a policy for purposes of *Monell*." . . . The Chief of Police's finding that [the] use of force was "in compliance" with the City of Chico's policies is more than sufficient to raise a genuine issue of material fact with respect to whether the City of Chico had a policy of using the force [applied] in this case. Although the finding was made after the incident, it constitutes clear evidence from which a rational jury could infer that the policy existed before the incident and therefore was the moving force that caused the injury. If the jury ultimately concludes that [the defendant officer] used excessive force and that the use of force comported with the City of Chico's policies, it would be entirely consistent with *Monell* to hold the City of Chico liable based on its policy promoting that use force.

*Id.* (citation and footnote omitted). Other district courts within the Ninth Circuit have similarly so held. *See Thomas v. Cannon*, No. 3:15-05346 BJR, 2017 WL 2289081, at *13 (W.D. Wash. May 25, 2017) ("Municipalities are required to review police shootings and carefully determine whether the shooting complied with local policy, and then determine whether or not discipline is appropriate. . . . A rational jury could find that [the officer's] decision to shoot was not constitutionally justified, and that [the official policymaker] ratified that unconstitutional decision by determining it was lawful and within policy.").

The court need not definitively resolve this arguable split in district court authority here because, even assuming the more stringent "something more" standard applies, the record viewed in a light most favorable to plaintiff indeed suggests the existence of that "something more" in this case. Specifically, plaintiff has also presented evidence on summary judgment calling into question the integrity of the department's internal affairs investigation into defendant Ramar's conduct, including the spoliation of Ramar's department-issued cell phone. Viewing this evidence in the light most favorable to plaintiff suggests that MPD was merely offering an excuse to avoid addressing plaintiff's citizen's complaint.

As noted above, defendant Ramar returned his department-issued cell phone to MPD on the last day of his employment. (Id. at ¶ 66.) That same day, an employee of MPD reset Ramar's department-issued cell phone to "factory settings, permanently erasing the phone's contents." (Id. at ¶ 67.) This action was consistent with MPD's custom "[w]hen the peace officer returns a cell

31

phone to the department." (*Id.* at ¶ 68.)  On March 24, 2020, plaintiff submitted another citizen-complaint, complaining this time that MPD had failed to take appropriate and legal steps to preserve the evidence on Ramar's department-issued cell phone.  (*Id.* at ¶ 69.)  MPD disposed of the complaint as "Other," which disposition according to policy called for the preparation of a "written explanation" in response, as opposed to Sustained, Not Sustained, Exonerated, or Unfounded.  (PX 37.)  The parties dispute whether "Other" is a permissible disposition of a citizen's complaint, and plaintiff contends that "Closed," but not "Other," is the fifth permissible option under state law.  (PSF at ¶¶ 70–71.)

Finally, "[o]rdinarily, ratification is a question for the jury. *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999).  "Although [a policymaker's] actions may have an innocent explanation, on summary judgment the only question is whether a rational juror could infer a noninnocent explanation." *Id.* at 1240.  With this in mind, the court concludes that the evidence presented on summary judgment reveals genuine disputes of material fact as to whether "something more" than a single failure to discipline or a policymaker's conclusion that the officer's actions were in keeping with department policy exist in this case and thus whether Chief Carroll ratified Ramar's use of force.  Among other things, the evidence that plaintiff's citizen complaint against Ramar's use of force was closed because Ramar resigned could be taken by the finder of fact as evidence that Carroll (and MPD more generally) was offering an excuse to avoid inquiring into the citizen complaint or believed there was nothing to be learned as an institution from investigating a citizen complaint against an officer who was no longer employed by MPD.

For these reasons, the court concludes that disputed issues of material fact have been established as to the existence of a relevant municipal policy.[16]

### 3.    Deliberate Indifference

Additionally, a municipal defendant may be liable under *Monell* only where the municipality's policies or customs "evince a 'deliberate indifference' to the constitutional right and are the 'moving force' behind the constitutional violation." *Edgerly v. City & Cnty. of San*

---

[16]  To the extent plaintiff intends to rely on any additional theories of *Monell* liability at the trial of this action, the parties may address such theories by way of motions *in limine*.

1   *Francisco*, 599 F.3d 946, 960 (9th Cir. 2010).  Thus, "[a] plaintiff must also demonstrate that the

2   custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [the

3   city's] inhabitants.' "  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) (*en*

4   *banc*) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).  Deliberate indifference

5   exists when a municipality "fail[s] to investigate and discipline employees in the face of

6   widespread constitutional violations."  *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 n.8

7   (9th Cir. 2011).  Municipal deliberate indifference in the context of a *Monell* claim is based on an

8   objective standard.  *Castro*, 833 F.3d at 1076.  A plaintiff need only "establish that the facts

9   available to [MPD] policymakers put them on actual or constructive notice that the particular

10  omission [or action] is substantially certain to result in" constitutional violations.  *Id.* (quoting

11  *City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part and

12  dissenting in part)).

13          In *Castro*, the plaintiff had been arrested for public drunkenness and placed in a sobering

14  cell.  833 F.3d at 1064–65.  Deputies at the police station then placed another arrestee, who

15  exhibited "bizarre" behavior after being arrested for feloniously shattering a glass door with his

16  fist, in the same cell.  *Id.* at 1065.  The station's sobering cells were used routinely, even though

17  they did not comply with county regulations and the police station's manual.  *Id.*  The other

18  arrestee attacked the plaintiff, who suffered severe injuries as a result.  *Id.*  The plaintiff's § 1983

19  lawsuit included a *Monell* claim, and the Ninth Circuit construed the county's policy as "to use a

20  sobering cell [that violated regulations and was insufficiently supervised.]"  *Id.* at 1075.  The

21  appellate court then went on to find that the policy was deliberately indifferent to plaintiff's

22  constitutional rights:

23              The West Hollywood sobering cell was non-compliant in at least two
                respects, in that it lacked all the required padding and, more
24              importantly for our purposes, did not allow for maximum visual
                supervision of prisoners by staff.

25
                The County Board of Supervisors' affirmative adoption of
26              regulations aimed at mitigating the risk of serious injury to
                individuals housed in sobering cells, and a statement to the same
27              effect in the station's manual, conclusively prove that the County
                knew of the risk of the very type of harm that befell Castro.  The
28              adoption of a regulation by the County's legislative body suffices as

                                                33

proof of notice because the County necessarily has knowledge of its own ordinances.  We have said that "a municipality's policies that explicitly acknowledge that substantial risks of serious harm exist" may demonstrate municipal knowledge of that risk for the purposes of a Fourteenth Amendment failure-to-protect claim.  Here, the ordinance adopted by the County is a policy that explicitly acknowledges the relevant substantial risks of serious harm.

Accordingly, the entity defendants had notice that their customs or policies posed a substantial risk of serious harm to persons detained in the West Hollywood sobering cell and were deliberately indifferent to that risk.

*Id.* at 1077–78 (quoting *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 n.10 (9th Cir. 2002),

*overruled on other grounds by Castro,* 833 F.3d at 1076).

Likewise, here, the parties agree that MPD has a written policy governing the use of force.

(PSF ¶ 29.)  MPD's written policy provides limits on the use of force during arrests and on the

use of deadly force generally.  (PX 13 §§ 300.3.1, 300.3, 300.4.)  As in *Castro*, that written policy

was "aimed at mitigating the risk of serious injury to individuals" who were subjected to the

policy.  833 F.3d at 1077.  MPD and Chief Carroll therefore "knew of the risk of the very type of

harm that befell [plaintiff]."  *Id.*  As discussed above, Carroll's alleged ratification of Ramar's

conduct could be taken as evidence of the existence of a policy of using deadly force even in

circumstances where the use of such force was inappropriate.  As in *Castro*, MPD and Carroll had

notice that any such custom or policy regarding the use of force posed a substantial risk of serious

harm and a reasonable finder of fact could conclude they were deliberately indifferent to that risk.

*See id.* at 1078.

### 4.    Causation or Moving Force

To show that a policy or custom is the "moving force" behind a violation, a plaintiff must

allege facts and ultimately prove that the policy or custom was "closely related to the ultimate

injury," *City of Canton*, 489 U.S. at 391, *i.e.*, that the constitutional violation was caused by the

municipal policy or custom.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *see also*

*Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir.2001).

Defendants argue that there is no causation here between any purportedly improper policy,

custom, or practice at MPD and the shooting of plaintiff.  (Doc. No. 85 at 31.)  According to

34

1  defendants, because the alleged ratification occurred post-shooting, a ratification theory of

2  imposing *Monell* liability fails due to lack of causation because MPD's *post*-shooting ratification

3  did not cause defendant Ramar to shoot plaintiff.  (*See id.*).  Plaintiff, citing the decision in

4  *Rosales*, argues that the ratification of the shooting is evidence of a pre-existing policy which a

5  jury may rely upon to infer causation.  (Doc. No. 93 at 28.)

6        The court is persuaded by and adopts the reasoning of the decision in *Rosales* as quoted

7  above.  There, the district court noted that at summary judgment, an official's ratification of a

8  police officer's actions is evidence of a preexisting policy, which in turn a jury can rely upon to

9  infer causation.  *Rosales*, 2015 WL 6167740, at *7 ("Although the finding was made after the

10  incident, it constitutes clear evidence from which a rational jury could infer that the policy existed

11  before the incident and therefore was the moving force that caused the injury."); *see also* Ninth

12  Circuit Manual of Model Civil Jury Instruction § 9.7 (rev. June 2021) (citing George M.

13  Weaver, *Ratification as an Exception to the § 1983 Causation Requirement: Plaintiff's*

14  *Opportunity or Illusion?*, 89 Neb. L. Rev. 358, 387–93 (2010) (discussing the distinction between

15  "true ratification" and the "substantial equivalent" of ratification as evidence of custom or

16  practice)).

17        Here, as in *Rosales*, plaintiff has established a genuine disputed issue of material fact as to

18  whether MPD had a policy of permitting the excessive use of force at issue based on Chief

19  Carroll's approval of the Shooting Review Board's finding that defendant Ramar's actions were

20  within MPD policy.  Hence, "[a]lthough the finding was made after the incident, it constitutes

21  clear evidence from which a rational jury could infer that the policy existed before the incident

22  and therefore was the moving force that caused the injury."  *Rosales*, 2015 WL 6167740, at *7.

23        For these reasons, the court will therefore deny defendants' motion for summary judgment

24  as to plaintiff's *Monell* claim.[17]

25  /////

26  /////

27

28  _____

[17]  Again, to the extent that plaintiff believes he has brought *Monell* claims based upon multiple
legal theories, the parties may address such theories by way of motion *in limine* prior to trial.

35

1  **E.    Supervisory Liability Against Chief Carroll**

2          Plaintiff opposes summary judgment as to any supervisory claim brought against Chief

3  Carroll because that claim overlaps with plaintiff's *Monell* claim.  (Doc. No. 93 at 28–29.)  This

4  issue, however, is not before the court since defendants do not appear to have moved for

5  summary judgment as to any supervisory liability claim brought against defendant Carroll in his

6  individual capacity.  (See Doc. No. 85 passim.)  Accordingly, the court will not address any

7  supervisory-liability claim.

8  **F.    California State-Law Claims**

9          Defendants next move for summary judgment on the following state-law claims brought

10  by plaintiff:  (1) excessive use of force in violation of California Constitution Article I, § 13; (2)

11  the Bane Act, California Civil Code § 52.1(b); (3) assault and battery; (4) intentional infliction of

12  emotional distress; and (5) negligence.  (Doc. No. 85 at 2.)  The court will address defendants'

13  motion for summary judgment with respect to each of plaintiff's state-law claims below.

14              1.    <u>California Constitution Article I, § 13</u>

15          Defendants argue that plaintiff's claim brought under the California Constitution is

16  redundant of his claim of excessive use of force under the Fourth Amendment to the U.S.

17  Constitution and, because the latter fails, the former must as well.  (Doc. No. 85 at 32.)  Plaintiff

18  opposes summary judgment as to this claim brought under the state constitution.  (Doc. No. 93 at

19  29.)

20          The California constitution provides "greater protection" against excessive force than the

21  federal constitution does.  *People v. Brisendine*, 13 Cal. 3d 528, 550–51 (1975).  Accordingly,

22  because the court concludes that triable issues of fact exist as to whether defendant Ramar's and

23  officer Olson's conduct violates the Fourth Amendment to the U.S. Constitution, defendants'

24  motion for summary judgment as to plaintiff's claim brought pursuant to the California

25  Constitution against Ramar will be similarly denied.  However, defendants' motion for summary

26  judgment as to plaintiff's claim under the California Constitution against any other defendant will

27  be granted due to plaintiff's non-opposition.  (*See* Doc. No. 95 at 29 (failing to oppose as to any

28  other defendant).)

36

2.      Bane Act:  California Civil Code § 52.1(b)

Defendants argue that plaintiff has failed to present evidence demonstrating that any defendant acted with the specific intent to violate his constitutional rights as required to support his claim under California's Bane Act.  (Doc. No. 85 at 32–33.)  Plaintiff counters that satisfying the "specific intent" requirement under the Bane Act "is not a particularly onerous task, where 'mere reckless disregard' of or 'deliberate indifference' to the underlying right is sufficient." (Doc. No. 93 at 29–30) (quoting *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) and *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 802 n.31 (2017)). Plaintiff's argument on this issue is persuasive.

An excessive use of force claim brought under the Bane Act "requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'"  *Reese*, 888 F.3d at 1043 (quoting *Cornell*, 17 Cal. App. 5th at 802).  A showing of a "reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights."  *Reese*, 888 F.3d at 1046 (citation omitted).

For instance, in *Reese*, the defendant police officers responded to an anonymous 911 call regarding an armed and "possibly crazy" man under the influence of drugs who had a knife and fired an automatic gun at a certain apartment.  888 F.3d at 1035.  The police knocked on the man's (Reese's) door and he opened it.  The police claimed he was holding a knife.  One officer shot him with a rifle, and another, Deputy Rose, entered the apartment and shot him again, despite being unable to see Reese's hands.  *Id.*  At trial, the jury concluded that Reese did not have a knife by the time Deputy Rose shot him and that it did not appear he was an immediate threat to the safety of Deputy Rose or others.  *Id.*  Nevertheless, the district court *sua sponte* granted summary judgment in favor of Deputy Rose as to the plaintiff's Bane Act claim.  *Id.* at 1041–42.  The Ninth Circuit reversed the grant of summary judgment finding that a reasonable jury could conclude that Deputy Rose acted with reckless disregard of Reese's constitutional rights.  *Id.* at 1045.

Likewise, here, a reasonable jury could conclude that defendant Ramar and officer Olson acted with reckless disregard based on the body camera evidence alone.  Ramar shot plaintiff very

shortly after he first encountered him and continued shooting him, even though he was unarmed. (Body Camera at 17:45:21–17:45:32.)  Ramar's actions are arguably comparable to Deputy Rose's because both shot an unarmed man very quickly upon encountering him.  *See also C.M. by & through McLain v. Cnty. of Los Angeles*, No. 17-cv-05135-VAP-AGRX, 2018 WL 5839644, at *2–3, 14 (C.D. Cal. Aug. 2, 2018) (finding a genuine dispute of material fact as to reckless disregard in connection with a Bane Act claim where the police ordered the plaintiff to raise his hands and then shot him when he raised them to mid-chest, all within seconds after getting out of their patrol car).  Additionally, a jury could reasonably conclude from the evidence before the court on summary judgment that Olson demonstrated a reckless disregard for plaintiff's right not to be subjected to the use of excessive force.  After plaintiff had been shot, Olson dragged plaintiff from his car and let his injured and bleeding body be placed onto the pavement facedown.

Accordingly, defendants' motion for summary judgment will be denied with respect to plaintiff's Bane Act claims brought against defendant Ramar and officer Olson.  Because plaintiff does not oppose the granting of summary judgment as to any other defendant  with respect to this claim(see Doc. No. 95 at 29–30), this aspect of the motion will be granted as to the other defendants as unopposed.

### 3.   Assault and Battery

Defendants move for summary judgment in their favor as to plaintiff's assault and battery claims.  (Doc. No. 85 at 32.)  Under California law, battery is the willful (or unlawful) use of force or violence upon another that causes injury, and assault is an (unlawful) attempt, coupled with a present ability, to commit a violent injury on another.  California Penal Code §§ 240, 243. Battery requires physical injury, but assault does not.  *Kiseskey v. Carpenters' Tr. for S. Cal.*, 144 Cal. App. 3d 222, 232 (1983).  In the police shooting context, a plaintiff must demonstrate that the officers' use of force was unreasonable to prevail on an assault or battery claim under California law.  *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998); *see also Davis v. City of San Jose*, 69 F. Supp. 3d 1001, 1008–09 (N.D. Cal. 2014).   Because the court has concluded above that triable issues have been shown to exist as to whether defendant Ramar's

1   conduct was reasonable, defendants' motion for summary judgment as to plaintiff's state law

2   claims for assault and battery will also be denied.

3                    4.        Intentional Infliction of Emotional Distress

4            To prevail on a state law claim for intentional infliction of emotional distress ("IIED"), a

5   plaintiff must demonstrate:  "(1) outrageous conduct by the defendant; (2) the defendant's

6   intention of causing or reckless disregard of the probability of causing emotional distress; (3) the

7   plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation

8   of the emotional distress by the defendant's outrageous conduct."  *Trerice v. Blue Cross of Cal.*,

9   209 Cal. App. 3d 878, 883 (1989).  Outrageous conduct must "be so extreme as to exceed all

10  bounds of that usually tolerated in a civilized society."  Id.  Conduct which exhibits mere

11  rudeness and insensitivity does not rise to the level required for a showing of intentional infliction

12  of emotional distress.  *Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991).

13           Defendants argue that summary judgment in their favor as to this claim is warranted

14  because the officers asked plaintiff to show his hands, "acted in self-defense, and to safeguard

15  innocent civilians in the immediate area" but provide no citations to California law in support of

16  these arguments.  (Doc. No. 85 at 33.)  The court concludes that there is sufficient evidence from

17  which a reasonable jury could find defendant Ramar liable as to plaintiff's IIED claim.  First,

18  Ramar's conduct could be found to be "outrageous" under the circumstances.  *See, e.g.*,

19  *Blankenhorn*, 485 F.3d at 487 n. 17 (finding that a police shooting could constitute an

20  "outrageous" act); *see also Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th

21  1004, 1045 (2009) ("In the usual case, outrageousness is a question of fact.").  Moreover, a jury

22  could reasonably conclude from the evidence that plaintiff suffered from emotional harm as a

23  result of being shot six times.  The same logic applies to officer Olson's acts in connection with

24  removing plaintiff from his car after the shooting.  If the finder of fact were to conclude that

25  Olson unreasonably dragged plaintiff out of the car and allowed him to land down on the

26  pavement after he had suffered significant gunshot wounds to the neck, shoulder, and upper torso

27  area of his body, that same jury could find that conduct to be outrageous.

28  /////

1    Accordingly, defendant's motion for summary judgment as to plaintiff's IIED claim

2    brought against defendant Ramar and officer Olson will be denied.  However, defendant's motion

3    for summary judgment as to the IIED claim brought against any other defendant will be granted

4    as unopposed.  (*See* Doc. No. 95 at 31–32 (failing to oppose as to any other defendant).)

5                    5.    Negligence

6         In order to prevail on his claim for common law negligence, plaintiff must show that (1)

7    defendants owed plaintiff a duty of care, (2) defendants breached that duty, (3) the breach caused

8    plaintiff's injury, and (4) plaintiff suffered damages.  *Spates v. Dameron Hosp. Ass'n.*, 114 Cal.

9    App. 4th 208, 213 (2003).  The analysis for state-law negligence claims in the police shooting

10   context is essentially the same as the analysis under the Fourth Amendment, except that

11   California negligence law allows courts to consider additional pre-shooting tactics, including

12   whether the officers "provoke[ed] a dangerous situation" that ultimately led to the use of deadly

13   force.  *See Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 639, 630 (2013).  Here, because the

14   court has concluded above that a reasonable jury could find that defendant Ramar used

15   unreasonable and excessive deadly force, defendants' motion for summary judgment as to

16   plaintiff's negligence claim against Ramar must be denied as well.  Defendants' motion for

17   summary judgment as to plaintiff's negligence claim brought against any other defendant will be

18   granted as unopposed.  (*See* Doc. No. 95 at 32–33 (failing to oppose as to any other defendant).)

19   **G.    Punitive Damages**

20        Defendants argue that dismissal of plaintiff's prayer for punitive damages is warranted

21   under both federal and state law because, according to defendants, "[t]here is no evidence

22   [d]efendants used force against [p]laintiff or acted against him with evil intent or motive" or with

23   a "reckless or callous indifference to his civil rights."  (Doc. No. 85 at 35.)  Plaintiff counters by

24   arguing that there is more than enough evidence before the court on summary judgment, when

25   viewed in a light most favorable to him, from which a jury could reasonably conclude that

26   defendants acted with the requisite mental state in violating plaintiff's constitutional rights.  (Doc.

27   No. 93 at 33.)

28   /////

With respect to defendant Ramar, as noted above, triable issues of material fact exist as to whether he acted in reckless disregard of plaintiff's constitutional rights.  With respect to officer Olson, defendants did not move for summary judgment as to plaintiff's claim that Olson used excessive force against plaintiff while arresting him.  Plaintiff argues that Olson pulled him out of his vehicle after he was shot six times, dropped him face-first onto the pavement, and handcuffed him.  (Doc. No. 93 at 24.)  The parties have not adequately briefed whether such conduct constitutes the excessive use of force, much less whether Olson acted in reckless disregard of plaintiff's rights in effecting his arrest.  Given that this issue has not been adequately briefed, the court will deny this aspect of defendants' motion for summary judgment with respect to Olson as well.

Accordingly, defendants' motion for summary judgment as to plaintiff's prayer for punitive damages will denied in all respects.

**H.     DOE Defendants**

Finally, defendants move for summary judgment as to any claims brought by plaintiff against unknown "DOE Defendants" because no individuals have been substituted-in or served since the operative complaint in this case was filed two years ago.  (Doc. No. 85 at 34.)  Plaintiff does not oppose dismissing the "DOE Defendants."  (Doc. No. 93 at 33.)   Therefore, defendants' motion for summary judgment as to the Doe defendants on this basis will be granted and the Doe defendants will be dismissed from this action.

## CONCLUSION

For the reasons explained above:

1.   Defendants' motion for summary judgment (Doc. No. 85) is denied in part and granted in part as set forth above;

2.   The court will defer ruling on defendants' motion for summary judgment only with respect to plaintiff's claim brought against officer Olson based upon his alleged failure to intercede;

/////

/////

41

3.  Twenty-one days from the service of this order, the parties are directed to submit simultaneous briefs, no longer than 7 pages in length, addressing the application of qualified immunity to plaintiff's claim brought against officer Olson based upon his alleged failure to intercede;

4.  Plaintiff's request to consider new authority (Doc. No. 96) is granted; and

5.  The Clerk of the Court is directed to now reassign this case to U.S. District Judge Jennifer L. Thurston and to remove the "NONE" designation.

IT IS SO ORDERED.

Dated:   __**January 31, 2022**__            _____

UNITED STATES DISTRICT JUDGE