1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  JASON B. PERKINS, | No. 1:19-cv-00126-JLT-EPG |
| 12         Plaintiff, | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AS TO FAILURE |
| 13     v. | TO INTERVENE CLAIM AGAINST DEFENDANT OLSON |
| 14  CITY OF MODESTO, et al., | |
| 15         Defendants. | |
| 16 | |

17                          **I.     INTRODUCTION**

18          Jason B. Perkins filed this civil rights action against defendants City of Modesto, Modesto

19   Police Department, MPD Chief of Police Galen L. Carroll, MPD officer Jerry J. Ramar, and MPD

20   officer Ryan Olson in their individual capacities, after plaintiff was shot multiple times by

21   Ramar. (Doc. 22.) The complaint brings claims under both the Fourth and Fourteenth

22   Amendments to the United States Constitution and Article I § 13 of the California Constitution,

23   as well as various state law claims. (*Id.*)

24          On February 1, 2022, the previously (temporarily) assigned jurist issued a lengthy order

25   granting in part and denying in part Defendants' motion for summary judgment. (Doc. 98 ("MSJ

26   Order").) That order left unresolved the question of whether Defendant Olson is entitled to

27   qualified immunity in connection with Plaintiff's failure-to-intercede claim against him. (*Id.* at

28   27.) The Court called for simultaneous supplemental briefing on that issue. (*Id.*) On February 7,

1   2022, the parties filed those briefs. (Docs. 108, 109.) The matter was taken under submission on

2   the papers. (Doc. 111.) For the reasons set forth below, Olson's motion for summary judgment as

3   to Plaintiff's claim that Olson failed to intervene in relation to Ramar's user of force is

4   GRANTED.

5                              III.    BACKGROUND

6   A.    Factual Background

7          The Court provided an extensive explanation of the background facts, viewed in a light

8   most favorable to Plaintiff, in the MSJ Order. The most pertinent portions of that recitation are

9   provided below for ease of reference:

10          **The Shooting**

11          Defendant Ramar and officer Olson were employed by the MPD on
            the day of the shooting, November 6, 2017. That day, they received
12          a dispatch to be on the lookout for a suspect—plaintiff—who was
            reportedly "wanted for a 417[1] on a [police] officer' and potentially
13          'armed and dangerous.'" ([Doc. 95-2 (Plaintiff's Statement of
            Material Facts and Defendants' Responses, ("PSF")]) at ¶ 2.) The
14          officers were informed that plaintiff was in a black Infiniti G35
            vehicle at a Bank of America parking lot. ([Doc. 93-2 (Defendants'
15          Statement of Material Facts and Plaintiff's Responses, ("DSF")]
            ¶ 17.) When the two officers arrived there by motorcycle, they
16          parked well behind plaintiff's vehicle. (Body Camera 17:45:19–20.)
            Plaintiff was alone in the front seat of the car. (DSF at ¶ 22.) Olson
17          activated his body camera, but Ramar, in violation of MPD policy,
            did not. (*Id.* at ¶ 27.)
18
19          Once defendant Ramar and officer Olson met at the parking lot,
            Ramar got off his motorcycle, drew his firearm, and jogged to
20          plaintiff's car. (Body Camera 17:45:21–26.) As he approached the
            driver's-side window, Ramar yelled, "Show me your hands, show
21          me your hands! I'm going to shoot you!" (*Id.* at 17:45:27–30.)
            Plaintiff was in the driver's seat, with his left hand pressing a
22          button to roll up his window and his right hand on the steering
            wheel, which was visible to both officers. (PSF at ¶¶ 11, 12.)
23          Within one second of issuing his directive, Ramar shot twice into
            plaintiff's car ("first volley"). (Body Camera at 17:45:30.) The first
24          volley hit plaintiff and shattered his car window. (PSF at ¶ 14.)
25          After the first volley, plaintiff's car traveled "several yards" in
            reverse, hit an island within the parking lot, and came to a stop.
26          (DSF ¶ 38; Body Camera 17:45:30–36.) Neither defendant was in
            the car's path when it moved in reverse, since they were both to the
27          car's side. (*Id.*) According to plaintiff, the first volley "disabled"

28   _____
     [1] California Penal Code § 417(c) generally criminalizes drawing or exhibiting a firearm in the immediate presence of
     a police officer in a rude, angry or threatening manner, if the offender acts with the requisite mental state.

                                          2

him "and caused him involuntarily to depress the vehicle's gas pedal." (PSF at ¶ 16.) This appears to be some degree of supposition; plaintiff testified at his deposition that he did not remember putting the car in reverse because he does not remember much after he pulled into the parking lot. (Defs.' Ex. ("DX") G, 138:6–8, 139:1–2.)

The officers moved again toward the car. Officer Olson and defendant Ramar positioned themselves next to plaintiff's broken driver-side window. Ramar was positioned in front of the window such that he would have been able to see at least part of the front of plaintiff's body. Olson, and thus his body camera, was positioned slightly behind the door and could see less of plaintiff's body. (*Id.* 17:45:30–38.) Ramar then shouted "let me see your hands!" twice. (*Id.* 17:45:36–38.) It is undisputed that plaintiff then raised his right hand, "which was visibly empty." (PSF at ¶ 17.) Plaintiff, who had just been shot, did not raise his left hand. (Body Camera 17:45:36–43.) Within two seconds of shouting his order, Ramar shot plaintiff again ("second volley"). (*Id.*) Ramar did not warn plaintiff before firing the second volley.

Immediately after Ramar shot the second volley, plaintiff's body slumped to the right. (PSF at ¶ 21.) Defendant Ramar then yelled, "Show your hands! Show your hands!" (*Id.* at ¶ 22.) Plaintiff's left shoulder visibly twitched but he did not turn or show his hands. (Body Camera 17:45:43–49.) Ramar then shot plaintiff again without warning ("third volley"). (*Id.*) It is undisputed that plaintiff sustained a total of six gunshot wounds, including to his jaw, chest, and left arm. (PSF at ¶ 26.)

After Ramar fired the six shots, the officers stood next to plaintiff's window and pointed their firearms at him for approximately one minute. (DSF ¶ 34; DSF ¶ 44.) After additional officers arrived at the scene, officer Olson removed plaintiff from the vehicle. (PSF ¶ 42.) Plaintiff went face down onto the cement upon being removed from the car. (Body Camera 17:48:10–16.) Defendants argue he was "guided" down, and plaintiff argues his body "struck" the ground. (PSF at ¶¶ 42–43.) Based on the court's review of the video, viewing the facts in the required light, when plaintiff's body was pulled out of the car, much of his body hit the ground with force, and his head was lowered more slowly. (Body Camera 17:48:10–16.)

**After the Shooting**

On November 7, 2017, defendant Ramar was interviewed by MPD's Investigative Services Division ("ISD"). (*Id.* at ¶ 51.) In that interview Ramar stated that: (1) he believed that he saw a gun when plaintiff rolled up his window, and he had fired the first volley of shots when plaintiff "was still reversing" his vehicle; (2) R[a]mar believed that he saw plaintiff "reaching towards his feet or towards the floorboard" before firing the second volley of shots; and (3) he believed that he saw "a movement like [plaintiff] was going down even further" before firing the third volley. (PSF at ¶ 52.)

***

**Defendant Ramar's Statements**

Defendant Ramar filed a declaration in support of his opposition to plaintiff's earlier motion for summary adjudication, almost exactly two years after the shooting of plaintiff occurred and about a year before he filed his declaration in support of the now pending motion for summary judgment. (*See* Doc. 36-1 at 4–7.) In his previous declaration filed in November 2019, Ramar repeatedly asserted that the threat he perceived was from plaintiff himself. For instance, before he fired the first volley at plaintiff, Ramar declared that he "thought [he] saw firearm in Plaintiff's right hand." (*Id.* ¶ 12.) In that 2019 declaration, defendant Ramar never suggested that he perceived any threat from plaintiff's vehicle or that plaintiff somehow posed a flight risk. The only threat that Ramar previously identified as providing him with the justification for his use of lethal force was his belief that plaintiff was reaching for a gun. In his second declaration (DX I, Declaration of Officer Jerry Ramar ("Ramar Decl.")), Ramar now declares that he approached plaintiff's vehicle quickly because he was "in fear that the plaintiff would be willing to assault officers or citizens in an attempt to evade arrest." (*Id.* at ¶ 8.)

**Expert Materials**

In connection with their pending motion for summary judgment, defendants have submitted a report prepared by a use of force expert opining on the underlying shooting. (DX F (Expert Report of Steve Papenfuhs).) In short, the defense expert states two opinions: the officers were responding to an emergency event, namely locating and arresting "a suspect with an outstanding warrant for crimes of violence"; and defendant Ramar reasonably believed plaintiff posed an "imminent and immediate threat to life." (*Id.* at 10, 12.)

Defendant Ramar did not timely activate his body camera to allow his shooting of plaintiff to be captured from his perspective. In place of what would have been that potentially highly relevant video evidence, defendants have submitted a video purportedly reconstructing the incident from Ramar's perspective at the time he fired the second and third volleys (but not the first volley). (DX E ("Incident Reconstruction Video"); *see also* DX D (Expert Report of Jason Fries).) Utilizing laser scanning and 3D modeling, this Incident Reconstruction Video purports to depict Ramar's line-of-sight which defendants argue shows that he did not have a clear view of plaintiff's hands.

In opposition to the pending motion for summary judgment, plaintiff has submitted a report from an expert with 27 years of experience with the Los Angeles County Sheriff's Department as a deputy sheriff, sergeant, and 15 years as a lieutenant. (PX 3 (Expert Report of Roger Clark) at 24.) In his report, plaintiff's expert concludes that defendant Ramar's firing of all three volleys of shots was unreasonable for a variety of reasons, including that plaintiff

never posed an imminent lethal threat to Ramar or anyone else. (*Id.* at 21–22.) Instead, expert Clark concludes, Ramar "ran directly into the scene without making any tactical approach" and his "abrupt shooting" was unnecessary and inappropriate. (*Id.* at 21.)

(MSJ Order at 3–8.) (footnotes omitted).)

**B.     Summary of Pertinent Conclusions of the MSJ Order**

Most relevant to the remaining issues on summary judgment are the MSJ Order's rulings concerning Ramar's use of force and the brief discussion in the MSJ Order concerning Olson's failure to protect liability.

1.     Ramar's Use of Force

As to Ramar's use of force, as the MSJ Order explained (MSJ Order at 12), a claim that a law enforcement officer used excessive force during an arrest is analyzed under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). Under "*Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest must be balanced against the need for force: it is the need for force which is at the heart of the *Graham* factors." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015). Therefore, in an excessive force case, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396). The MSJ Order zeroed in on the "most important" governmental-interest factor: "whether the suspect posed an immediate threat to the safety of the officer or others," (MSJ Order at 15 (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011)), and summarized the relevant law as follows:

"In deadly force cases, where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Glenn v. Washington Cnty.*, 673 F.3d 864, 879 (9th Cir. 2011). Similarly, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. There must be other significant circumstances that warrant the use of such a degree of force at the time it is used." *Deorle*, 272 F.3d at 1281. Thus, "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of

injury to person." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). Moreover, an armed suspect is not inherently an immediate threat to the officers' or others' safety. *Roderick*, 126 F.3d at 1204; *George*, 736 F.3d at 838 ("[T]he fact that the 'suspect was armed with a deadly weapon' does not render the officers' response per se reasonable under the Fourth Amendment." (quoting *Glenn*, 673 F.3d at 872–73)); *Deorle*, 272 F.3d at 1281 ("a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."). At the same time, officers need not "delay their fire until a suspect turns his weapon on them." *George*, 736 F.3d at 838. "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.*

(MSJ Order at 15–16.)

The MSJ Order then carefully parsed the factual record before finding "several genuine disputes of material fact concerning the immediate-threat factor." (*Id.* at 16.)

A jury could find Ramar's stated belief that plaintiff was armed to be unreasonable for several reasons. It is undisputed on summary judgment that when Ramar approached plaintiff, "Plaintiff's right hand was on the steering wheel, which was visible to Defendants Ramar and Olson." (PSF at ¶ 11.) A jury could conclude that Ramar's claimed belief that plaintiff[] was holding a firearm in plaintiff's right hand (Ramar Decl. at ¶ 13) was unreasonable, given that plaintiff's right hand was visibly on the steering wheel of his vehicle. Moreover, plaintiff's left hand was pressing a button to roll up his window. A jury could also conclude that plaintiff's act of rolling up the car window was inconsistent with any suggestion that he was about to somehow use a weapon from inside of the vehicle. In short, a reasonable jury could conclude from the evidence that it is unreasonable to believe that someone rolling up a window is about to shoot out of it. In sum, a jury could conclude from the evidence that there was no reasonable basis to believe plaintiff was armed.

If a jury concluded that Ramar had no reasonable basis to suspect that plaintiff was armed—Ramar's rationale for why he believed plaintiff posed a threat—Ramar's use of deadly force would be unreasonable as a matter of law. *See Nehad*, 929 F.3d at 1132–33 ("The use of deadly force is only reasonable if a suspect 'poses a significant threat of death or serious physical injury to the officers or others.'" (*quoting Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014))).

Alternatively, based on the Body Camera evidence alone, a reasonably jury could conclude that, even if Ramar reasonably believed plaintiff had a weapon in the car, plaintiff did not make any furtive movements—at least not any visible to defendant Ramar—that would justify the use of deadly force in his firing of the second and third volley of shots. *See George*, 736 F.3d at 838. Among other things, plaintiff had been shot in his left arm and on

the left side of his body before the second and third volleys were fired. The Body Camera footage before the court on summary judgment clearly shows plaintiff raising his right arm in what could reasonably be interpreted as an attempt to surrender. (Body Camera at 17:45:37.) Based upon this evidence a reasonable jury could disbelieve Ramar's claims that plaintiff made furtive movements with either arm. *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 710 (9th Cir. 2017) (there is a clearly established right against being shot "while unarmed, surrounded by law enforcement, and in the process of surrendering" and "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (citation omitted)).

Defendants now argue that the immediate threat was plaintiff's vehicle, not just plaintiff himself. (*See* Doc. 85 at 21–22.) They cite to one paragraph in defendant Ramar's second declaration in which he states that he was concerned about one patron in the parking lot who could have gotten between Ramar and plaintiff and that Ramar therefore was "in fear that the plaintiff would be willing to assault officers or citizens in an attempt to evade arrest." (Ramar Decl. at ¶ 8.) However, viewed in a light most favorable to plaintiff, the Body Camera evidence presented on summary judgment is certainly arguably inconsistent with any assertion that plaintiff's vehicle posed a threat to anyone. Plaintiff's vehicle was moving very slowly (if at all) when Ramar first shot plaintiff. Moreover, plaintiff's car was at a complete stop when Ramar fired off the second and third volleys. The Body Camera evidence establishes that Ramar and officer Olson were not in the path of plaintiff's car, nor does it appear from the video that Ramar was looking for or saw any citizens while he was shooting. (*See* Body Camera at 17:45:28–17:45:45.) Therefore, based on this evidence a reasonable jury could reject defendants' assertion that plaintiff's vehicle posed a danger to anyone when Ramar fired. Moreover, based on applicable case law, it does not appear that plaintiff's vehicle posed the type of threat that would permit the use of deadly force in any event. *See Orn v. City of Tacoma*, 949 F.3d 1167, 1180 (9th Cir. 2020) ("The cases upholding the use of deadly force to protect the public from a fleeing motorist have typically involved suspects who drove at extremely high speeds, endangered other motorists on the road, or intentionally targeted police officers with their vehicles.").

Finally, defendant Ramar's credibility may well be at issue in this case. "Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016). Although it is undisputed that plaintiff's right hand was on the visible steering wheel, Ramar declares that he thought he saw a firearm in plaintiff's right hand. (PSF ¶ 11; Ramar Decl. ¶ 13.) Moreover, the Body Camera evidence before the court does not clearly confirm critical aspects of Ramar's account of the events at issue. Defendants object to many of plaintiff's statement of material facts on the grounds that, according to them, the Body Camera evidence is "unclear"—not because the video recording reinforces or supports Ramar's stated belief that plaintiff's actions posed a danger to Ramar or others. (*See, e.g.*, PSF at ¶¶ 21–23.) In

addition, and as noted above, Ramar did not activate his body camera until after firing his sixth and final shot at plaintiff despite the fact that he had ample opportunity and reason to do so from the outset. The Bank of America parking lot was Ramar's second location in searching for defendant—a man wanted for assaulting a police officer and whom Ramar believed was armed and dangerous. A reasonable jury could conclude that Ramar had ample time to activate his body camera before getting to the parking lot or before approaching plaintiff. A reasonable jury may doubt Ramar's account of events on the basis that he had elected to violate MPD's body-camera policy. *See Drummond ex rel. Drummond*, 343 F.3d at 1059 (explaining that a failure to comply with departmental policies may be indicative of the officer' state of mind at the time force was applied).

(MSJ Order at 16–19.)

Having found that triable issues of fact existed as to whether Plaintiff's rights under the Fourth Amendment were violated, the Court next turned to the second step of the qualified immunity analysis: whether plaintiff's right was clearly established at the time of the shooting. The Court ultimately concluded that viewing the evidence in the light most favorable to Plaintiff, Plaintiff was shot six times in a slowly moving and/or parked vehicle while unarmed and, with respect to the second and third volleys, attempting to surrender. (*See* MSJ Order at 23.) The MSJ Order found "the general standards set forth by the Supreme Court in *Garner* and *Graham*, as well as Ninth Circuit precedent, put defendant Ramar on notice that he could not use deadly force against plaintiff." (*Id.*)

First and foremost, there are triable issues of fact as to Ramar's belief about plaintiff being armed. A reasonable jury could conclude that the belief was unreasonable, or that Ramar never had such a belief in the first place. If a jury so concludes, the primary rationale—or the sole one if the jury disregards Ramar's late-offered explanation that he also feared plaintiff's vehicle —Ramar would not be entitled to qualified immunity with respect to any of the shots he fired. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); [*Scott v.*] *Henrich*, 39 F.3d [912,] 914 [(9th Cir. 1994)] ("An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" (citation omitted)). Indeed, plaintiff contends he was shot for no reason as he "posed no threat" to the officers or the public generally. (*See* Doc. 93 at 18.) If the jury accepts that view of the facts, then qualified immunity would not apply here. *Rodriguez* [*v. Swartz*], 899 F.3d [719,] 733 [(9th Cir. 2018)] ("Any reasonable officer would have known, even without a judicial decision to tell

8

him so, that it was unlawful to kill someone—anyone—for no reason.").

Second, even if a jury concluded that defendant Ramar reasonably believed plaintiff was armed, using deadly force against someone simply because they are armed, with no other evidence of imminently threatening behavior, violates clearly established law. *See George*, 736 F.3d at 838–39 (Requiring an armed suspect to make some furtive or otherwise threatening movement, stating "the fact that the suspect was armed with a deadly weapon does not render the officers' response [of using deadly force] per se reasonable under the Fourth Amendment." (cleaned up)); *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) (same); *Roderick*, 126 F.3d at 1204 ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."). This would be true with respect to any of the three volleys fired by Ramar, including the first volley which was fired at the time plaintiff purportedly was attempting to flee—i.e., his vehicle started to slowly move in reverse. *See Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

Viewing the evidence on summary judgment in a light most favorable to plaintiff, that plaintiff rolled up his car window immediately after Ramar shouted "show me your hands" did not provide a reasonable basis for Ramar's firing of the first volley of shots. Additionally, and in particular viewing the evidence in a light most favorable to plaintiff, it was clearly established that Ramar could not fire the second volley and third volley of shots. "[An individual]'s Fourth Amendment right not to be shot [] while unarmed, surrounded by law enforcement, and in the process of surrendering is clearly established such that [] 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Longoria*, 873 F.3d at 710 (quoting *Hernandez v. Mesa*, 582 U.S. 548, 555 (2017))). Here, if a jury were to find that it was unreasonable to suspect that plaintiff was armed or had made any furtive movements, but that he was instead attempting to surrender immediately before the second and third volleys were fired, Ramar would not be entitled to qualified immunity. *See, e.g., Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 967 (E.D. Cal. 2017) ("[The suspect] was asked to stop. A jury could conclude that he did."); *see also Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) ("[T]erminating a threat doesn't necessarily mean terminating the suspect. If the suspect . . . appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting.").

Finally, although there is no direct evidence before the court on summary judgment suggesting that defendant Ramar himself perceived a threat from plaintiff's vehicle (as opposed to from plaintiff possibly reaching for a weapon). Even if such a threat could be inferred from the evidence, Ramar still would not be entitled to qualified immunity. "The right not to be shot in a car that

9

poses no immediate danger to police officers or others is clearly established." *Losee v. City of Chico*, 738 F. App'x 398, 400 (9th Cir. 2018); *see also Acosta v. City & Cnty. of San Francisco*, 83 F.3d 1143, 1148 (9th Cir. 1996) ("the law governing 'shooting to kill' a fleeing suspect is clearly established" and "a reasonable officer could not have reasonably believed that shooting at the driver of the slowly moving car was lawful"); *Villanueva v. California*, 968 F.3d 1158, 1172 (9th Cir. 2021) ("In light of *Acosta*, all reasonable officers would know it is impermissible to shoot at a slow-moving car when he could simply step to the side to avoid danger."); *Orn*, 949 F.3d at 1180 ("The cases upholding the use of deadly force to protect the public from a fleeing motorist have typically involved suspects who drove at extremely high speeds, endangered other motorists on the road, or intentionally targeted police officers with their vehicles.").

Here, when defendant Ramar fired the first shots, plaintiff's car was hardly moving. (Body Camera 17:45:30–31.) For the second and third volleys, plaintiff's car was completely stopped. Thus, a reasonable jury could determine that plaintiff's car was not a threat whatsoever, and in such situations, the Ninth Circuit had determined qualified immunity is inappropriate. *See, e.g., Acosta*, 83 F.3d at 1146 ("On the basis of the evidence presented at trial, the jury could have reasonably concluded that a reasonable officer, who had positioned himself facing the driver so that he was standing closer to the side than the dead-center of the car, would have recognized that he could avoid being injured when the car moved slowly, by simply stepping to the side.").

In sum, viewing the facts in a light most favorable to plaintiff, Ramar's conduct would squarely fall within the scope of existing caselaw establishing that use of deadly force amounts to a constitutional violation. Accordingly, Ramar is not entitled to summary judgment in his favor on qualified immunity grounds. *See LaLonde*, 204 F.3d at 953.

(MSJ Order at 23–26.)

### 2. Olson's Use of Force

The MSJ Order then raised the question of how qualified immunity should be applied to Plaintiff's failure to intercede claim against Olson:

[W]ith respect to the failure-to-intercede claim, the Ninth Circuit has suggested that because there is no clear caselaw regarding when an officer is required to intervene, such claims would always be barred by qualified immunity. *Penaloza v. City of Rialto*, 836 F. App'x 547, 549-50 (9th Cir. 2020) ("Our precedent does not clearly establish when an officer has a 'realistic opportunity to intercede.'") Because defendants have raised the affirmative defense of qualified immunity in their answer (Doc. 24 at 23), the court will *sua sponte* direct the parties to brief the issue. *See Easley v. City of Riverside*, 890 F.3d 851, 955 (9th Cir. 2018), rev'd on other grounds on hearing en banc, 765 F. App'x 282 (9th Cir. 2019).

1 (MSJ Order at 27.)[2]

2 ## II.   LEGAL STANDARDS

3 ### A.   General Summary Judgment Standard

4 Summary judgment is appropriate when the moving party "shows that there is no genuine

5 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6 Civ. P. 56(a). In summary judgment practice, the moving party "initially bears the burden of

7 proving the absence of a genuine issue *Celotex* of material fact." *In re Oracle Corp. Sec. Litig.*,

8 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

9 The moving party may accomplish this by citing to particular parts of materials in the record," or

10 by showing that such materials "do not establish the absence or presence of a genuine dispute, or

11 that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

12 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the

13 opposing party to establish that a genuine issue as to any material fact exists. *See Matsushita*

14 *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the

15 existence of this factual dispute, the opposing party is required to tender evidence of specific facts

16 in the form of affidavits, and/or admissible discovery material, in support of its contention that the

17 dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am.,*

18 *NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence

19 in ruling on a motion for summary judgment."). The opposing party must demonstrate that the

20 fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the

21 governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv.,*

22 *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

23 genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving

24 party, *see Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

25 In the endeavor to establish the existence of a factual dispute, the opposing party need not

26

27 [2] *Easley* indicated that a district court may raise the issue of qualified immunity *sua sponte* and address that issue so long as the defendant raised the issue in an answer and did not waive or abandon that defense, and the plaintiff was provided notice and an opportunity to address the issue. 890 F.3d at 855; *see also id.* (failure to move for summary judgment on qualified immunity does not constitute waiver). Here, Olson asserted the defense in his answer and no party has argued the defense has been waived. (*See* Doc. 24 at 23.)

28

establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

Finally, where there is video evidence of the incident giving rise to the excessive use of force claim, a court must "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380–81. Nonetheless, even when video evidence exists, the circumstances may be such that a reasonable finder of fact could draw divergent conclusions from what the video evidence shows. *See Nehad v. Browder*, 929 F.3d 1125, 1132–39 (9th Cir. 2019) (disputed issues of material fact precluded summary judgment in an action alleging excessive use of force even though the evidence included surveillance footage); *Glenn v. Washington Cnty.*, 673 F.3d 864, 878 (9th Cir. 2011) ("The circumstances of this case can be viewed in various ways, and a jury should have the opportunity to assess the reasonableness of the force used after hearing all the evidence.").

**B.    General Qualified Immunity Standards**

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."

*Pearson v. Callahan,* 555 U.S. 223, 244 (2009). The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 231 (internal quotation omitted). When presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts, taken in the light most favorable to the plaintiff, demonstrate that the defendants' conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established" at the time of the event in question. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *accord Pearson*, 555 U.S. at 236–42 (holding that courts need not analyze the two prongs in any particular order).

A right is clearly established if the law was "sufficiently clear that every reasonable official would understand that what he is doing" is unlawful. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Young v. City of Los Angeles*, 655 F.3d 1156, 1167 (9th Cir. 2011) ("[T]he relevant inquiry is whether the state of the law at the time of the official conduct complained of was such as to give the defendants fair warning that their conduct was unconstitutional—that a fair application of well-established legal principles would warrant such a conclusion.").

"Except in the rare case of an 'obvious' instance of constitutional misconduct," a plaintiff must identify a controlling case existing at the time of the incident where an officer acting under similar circumstances as the defendants was held to have violated the constitutional right at issue. *See Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). The Ninth Circuit has held that "the 'obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context,'" and "thus has 'real limits when it comes to the Fourth Amendment.'" *O'Doan v. Sanford*, 991 F.3d

1  1027, 1044 (9th Cir. 2021) (quoting *Sharp*, 871 F.3d at 912); *see also Mullenix v. Luna*, 577 U.S.

2  7, 12 (2015) ("[S]pecificity is especially important in the Fourth Amendment context, where the

3  Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant

4  legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'").

5  Put another way, the caselaw must "have been earlier developed in such a concrete and factually

6  defined context to make it obvious to all reasonable government actors, in the defendant's place,

7  that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117

8  (9th Cir. 2017); *see also Kisela*, 138 S. Ct. at 1152 ("This Court has repeatedly told courts—and

9  the Ninth Circuit in particular —not to define clearly established law at a high level of

10 generality.") (internal citation and quotation omitted). This inquiry must consider the specific

11 factual context of the particular case. *City of Escondido, Cal. v. Emmons*, ___ U.S. ____, 139 S.

12 Ct. 500, 503 (2019).

13 **C.     Qualified Immunity Burdens of Proof**

14       "Ninth Circuit law is not a model of clarity concerning which party has the burden of

15 proof when the defense of qualified immunity has been raised." *Andrich v. Kostas*, 470 F. Supp.

16 3d 1048, 1061 n.5 (D. Ariz. 2020). As *Andrich* accurately summarized:

17
18           On the one hand, many Ninth Circuit opinions hold that "[o]nce the
             defense of qualified immunity is raised by the defendant, the
             plaintiff bears the burden of showing that the rights allegedly
19           violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d
             1146, 1157 (9th Cir. 2000). *See also Shafer*, 868 F.3d at 1118
20           ("Shafer argues that it is Deputy Padilla's burden to demonstrate
             that he did not violate Shafer's clearly established constitutional
21           right. Again, we disagree."). On the other hand, other Ninth Circuit
             opinions hold that "[q]ualified immunity is an affirmative defense
22           that the government has the burden of pleading and proving."
             *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). These
23           opinions are difficult to reconcile. *See generally Slater v. Deasey*,
             943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from
24           denial of rehearing en banc) ("The panel committed . . . error in
             suggesting that Defendants bear the burden of proof on the disputed
25           qualified-immunity issues presented in this appeal . . . . [T]he
             applicable—and well-settled—rule is that '[t]he plaintiff bears the
26           burden of proof that the right allegedly violated was clearly
             established at the time of the alleged misconduct.'") (citation and
             emphases omitted).
27

28 *Andrich*, 470 F. Supp. 3d at 1061 n.5.

14

1   In practice, however, where a decision turns on the second step of the qualified immunity

2   analysis, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is

3   clearly established.'" *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 562 U.S. at 741) (emphasis in

4   original). As to that question, there appears to be little debate that the plaintiff bears the burden to

5   show the official violated a "clearly established" federal right. *Sweaney v. Ada County*, 119 F.3d

6   1385, 1388 (9th Cir. 1997).[3]

7                                          **IV.      ANALYSIS**

8   The sole issue to be decided here is whether Olson is entitled to qualified immunity in

9   relation to Plaintiff's failure to intercede claim against him.[4] Plaintiff contends that there is

10  evidence to suggest that Olson could have intervened in the unconstitutional conduct in this case,

11  but instead "acquiesced" to Ramar's decision to approach Plaintiff without waiting for additional

12  backup and to all three volleys of shots. (Doc. 109 at 5.) Defendants argue that Olson is entitled to

13  qualified immunity because no precedent clearly established that Olson was supposed to

14  intervene under similar circumstances. (*See generally* Doc. 108.)

15  The supplemental briefs focus on Olson's alleged failure to intervene during the shooting

16  itself. This analysis therefore also focuses on Olson's liability in connection with the shooting,

17  which the Court discusses first. The Court then also briefly addresses Plaintiff's related

18  assertion—made almost in passing—that Olson could be liable for his failure to intercede in

19  Ramar's strategic decision to approach Plaintiff's vehicle without waiting for additional resources

20  to arrive. (Doc. 93 at 23; Doc. 109 at 4–5.)

21  **A.      Olson's Liability in Connection with the Shooting**

22          **a.      Constitutional Violation**

23

---

24  [3] Because this case can be resolved on the "clearly established law" prong of the qualified immunity analysis, the Court need not struggle with the arguably more fundamental conflicts in the qualified immunity burden caselaw.

25
26  [4] The MSJ Order concluded that Defendants did not "move[] for summary judgment as to plaintiff's claim based on officer Olson's alleged use of force in removing plaintiff from his vehicle after he was shot by Ramar." (MSJ Order at 29.) Defendants did not move for reconsideration as to that conclusion and the MSJ Order did not invite further

27  briefing on that issue. Defendants nonetheless included argument in their supplemental brief about whether Olson is entitled to qualified immunity as to any force he used to remove Plaintiff from the vehicle. (Doc. 108 at 7–9.)

28  Because that briefing was not called for by the Court, Plaintiff did not address the issue in his supplemental brief. The Court will therefore not address the matter.

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen," but only when they have a "realistic opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000) (internal quotation and citation omitted). The caselaw sheds some light on what it means to have a "realistic opportunity to intercede" in another officer's user of force. On the one end of the scale are cases in which officers who did not use force had essentially no time (and therefore no "realistic opportunity") to intervene. For example, in *Cunningham*, two separate officer-involved shootings were at issue. In the first, officers permitted two individuals to rob a store, and then used their police cars to "jam" the getaway car into a confined space. *Id*. at 1278. The officers then "opened fire" on the two suspects "without announcing themselves as police." *Id*. at 1279. The second shooting took place during police pursuit of a different robbery suspect. *Id*. A person unconnected to the robberies began running away from the police presence but was blocked by a police vehicle. *Id*. Officers directed him to "freeze" and then shot him in the leg. *Id*. In both cases, there were non-shooting officers at the scene. The Ninth Circuit concluded that "the undisputed evidence showed that the non-shooting officers who were present at the shootouts had no 'realistic opportunity' to intercede" and therefore could not be held liable. *Id*. at 1290; *see also Cortesluna v. Leon*, 979 F.3d 645, 656 (9th Cir. 2020) (volleys of beanbag shots unfolded "in a matter of seconds," so non-shooting officer lacked any realistic opportunity to intercede), *rev'd on other grounds Rivas-Villegas v. Cortesluna*, ___ U.S. ___ 142 S. Ct. 4 (2021); *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) (no failure to intervene liability when "the agents were positioned around the room away from [the shooting agent and the plaintiff] and were thus physically incapable of preventing the incidents surrounding the shooting, all of which transpired in a matter of seconds."); *Adams v. Kraft*, No. 10-CV-00602-LHK, 2011 WL 846065, at *10 (N.D. Cal. Mar. 8, 2011) (no failure to intervene in another officer's use of pain compliance hold because no allegations that hold was in place for long enough to permit intervention; likewise, no liability for separate claim about a kick to plaintiff's hand because the kick "occurred quickly and without warning").

Relatedly, courts have considered whether there is any evidence to suggest that the

observing officer could have anticipated that the other officer would use force in the manner ultimately employed. *Atencio v. Arpaio*, 674 F. App'x 623, 626 (9th Cir. 2016) (finding no integral participation by officer who witnessed the use of excessive force in the form of a knee strike during a struggle between officers and the plaintiff, because there was no evidence that the witnessing officer "directed or otherwise knew that the solitary knee strike would occur, physically participated in the knee strike, or had a realistic opportunity to stop the knee strike from happening); *Williamson v. California Highway Patrol*, No. 10-CV-2236-IEG NLS, 2012 WL 1327860, at *2–5 (S.D. Cal. Apr. 17, 2012) (no constitutional violation where there was no evidence to suggest the witnessing officer could have anticipated that arresting officer would have kicked away the cane being used by a disabled person who was being placed under arrest).

On the other end of the spectrum are cases where sufficient time elapsed between an initial use of force and a subsequent one, thereby permitting the observing officer an opportunity to intervene. For example, in *Aragonez v. Cnty. of San Bernardino*, No. EDCV 07-00992-VAP, 2008 WL 4948410, at *7 (C.D. Cal. Nov. 18, 2008), the court concluded that a reasonable jury could find that an observing officer had an opportunity to intervene where there was over a minute between applications of pepper spray by another officer on arguably compliant individuals.[5] *See also Segura v. Miller*, No. 6:20-CV-00911-YY, 2022 WL 1492612, at *1 (D. Or. Mar. 28, 2022), *report and recommendation adopted in part, rejected in part*, No. 6:20-CV-911-YY, 2022 WL 1165728 (D. Or. Apr. 20, 2022) (finding a material dispute of fact as to observing officers' liability where a prisoner asserted he was thrown to the ground, kicked, and punched by several sheriff's deputies as they dragged him down the hall, and several other inmates had time to comment that he was not resisting and plead for the officers to stop beating the plaintiff, all while other deputies stood by and watched); *Beltran v. Cnty. of San Bernardino*, No. EDCV19-01522-CJC-KKX, 2021 WL 3185474, at *6 (C.D. Cal. Jan. 28, 2021) (relying on *AGG* to find genuine dispute of fact where observing officer was "fifteen to twenty feet" away

---

[5] Certain other cases discussed below in the context of the second qualified immunity prong (clearly established law) do not evaluate in any detail why a reasonable jury could find that the observing officers had a reasonable opportunity to intervene. *See Robins v. Meecham*, 60 F.3d 1436 (9th Cir. 1995) (explaining only that the observing corrections officers were in the "control bubble" with the shooting officer and the injured inmate). Such cases are therefore generally unhelpful in evaluating whether a constitutional violation occurred.

from where another officer was allegedly beating and tasering the plaintiff; even though observing officer was dealing with another suspect, she may have been aware of what was happening because of Plaintiff's cries for help); *AGG v. City of Hayward*, No. 19-CV-00697-DMR, 2020 WL 6047233, at *8 (N.D. Cal. Oct. 13, 2020) (observing supervising officer had time to call out warning to shooting officers, but stopped talking because it didn't seem they could hear her; court concluded a jury could find she had a reasonable opportunity to intervene because "she had time to—and in fact did—insert herself into the situation and then chose to stop").

*Knapps v. City of Oakland*, 647 F. Supp. 2d 1129 (N.D. Cal. 2009), provides examples of conduct that fall on either side of the "reasonable opportunity to intervene" line. There, one police officer (Cardoza) "placed Plaintiff in a carotid hold by putting his arm around Plaintiff's neck and dropping him to the ground" while two other officers (Rojas and Kelly) were nearby. *Id*. at 1142–43. After Cardoza released the carotid hold, Rojas and Kelly put handcuffs on plaintiff. *Id*. at 1144. Cardoza then applied a "bent wrist hold," which is a "painful" technique for moving a person who is handcuffed. *Id*. While the "bent wrist hold" was being applied, the plaintiff complained that he was in pain, but Rojas and Kelly took no action. *Id*. Plaintiff asserted a failure to intervene claim against Rojas and Kelly. *Id*. at 1159. After a non-jury trial, the court found Rojas and Kelly liable for failure to intervene as to one use of force but not the other. As to the use of the carotid hold, the district court concluded that Rojas and Kelly did not have a realistic opportunity to intercede "given the short time period in which the incident took place," and because plaintiff's non-resistance gave them no reason to anticipate Cardoza's use of the hold. *Id*. at 1159–60. In contrast, with regard to the bent wrist hold, the district court concluded that Rojas and Kelly were liable because: (1) "[g]iven their proximity to Officer Cardoza, there is no evidence that anything prevented them from stopping Officer Cardoza's unjustified use of the wrist lock"; (2) "unlike the suddenness of the carotid hold, the use of the wrist lock occurred over a relatively longer period of time"; and (3) "Plaintiff complained that the wrist hold was hurting him." *Id*. at 1160.

*Andrich*, 470 F. Supp. 3d 1048, is a recent district court case that thoughtfully discusses these concepts in the context of a police shooting. In *Andrich*, two officers (Kostas and Peters)

"contacted" the plaintiff on a street in Phoenix. *Id*. at 1053. Andrich alleged he was unarmed and suffering from an obvious mental illness. *Id*. Both officers attempted to physically restrain Andrich and then began using hands and fists and then their tasers against him. *Id*. Then, as Andrich was allegedly "turning away," Kostas shot and killed Andrich. *Id*. Plaintiff alleged that Peters had the opportunity to deescalate the situation and avoid all force" but "failed to do so" and also "failed to intervene to prevent the fatal shooting" despite the "ability and duty" to do so. *Id*. at 1060. On a motion to dismiss, the district court concluded that the amended complaint failed to allege facts indicating Peters had the opportunity to stop Kostas from shooting the plaintiff. *Id*. at 1060–61. Even assuming Peters "escalated the situation through his initial use of fist strikes and a taser," the court concluded that such escalation did not show he had the opportunity to intervene with respect to Kostas's subsequent decision to shoot Andrich. *Id*. at 1061.

Here, the Court accepts the facts as described in the MSJ Order, which viewed the record in the light most favorable to Plaintiff. For purposes of the present analysis, the following facts are most relevant to Olson's alleged failure to intervene in the shooting:[6]

- On the day of the shooting, November 6, 2017, Ramar and Olson received a dispatch to be on the lookout for a suspect—Plaintiff—who was reportedly "wanted for a 417 on a [police] officer' and potentially 'armed and dangerous.'" The officers were informed that plaintiff was in a black Infiniti G35 vehicle at a Bank of America parking lot. When the two officers arrived there by motorcycle, they parked well behind plaintiff's vehicle. (Body Camera 17:45:19–20.) Plaintiff was alone in the front seat of the car.

- Once defendant Ramar and officer Olson met at the parking lot, Ramar got off his motorcycle, drew his firearm, and jogged to Plaintiff's car. (*Id*. at 17:45:21–26.) As he approached the driver's-side window, Ramar yelled, "Show me your hands, show me your hands! I'm going to shoot you!" (*Id*. at 17:45:27–30.) Plaintiff was

---

[6] The Court omits most of the record citations from this summary of the evidence, as those citations are provided above. Here, the Court has left only the Body Camera citations for purposes of illustrating the timeline.

in the driver's seat, with his left hand pressing a button to roll up his window and his right hand on the steering wheel, which was visible to both officers. Within one second of issuing his directive, Ramar shot twice into Plaintiff's car ("first volley"). (*Id*. at 17:45:30.) The first volley hit Plaintiff and shattered his car window.

- After the first volley, Plaintiff's car traveled "several yards" in reverse, hit an island within the parking lot, and came to a stop. (*Id*. at 17:45:30–36.) Neither defendant was in the car's path when it moved in reverse, since they were both to the car's side. (*Id.*) According to Plaintiff, the first volley "disabled" him "and caused him involuntarily to depress the vehicle's gas pedal."

- The officers moved again toward the car. Officer Olson and defendant Ramar positioned themselves next to Plaintiff's broken driver-side window. Ramar was positioned in front of the window such that he would have been able to see at least part of the front of Plaintiff's body. Olson, and thus his body camera, was positioned slightly behind the door and could see less of Plaintiff's body. (*Id.* at 17:45:30–38.) Ramar then shouted "let me see your hands!" twice. (*Id.* at 17:45:36–38.) It is undisputed that Plaintiff then raised his right hand, "which was visibly empty." Plaintiff, who had just been shot, did not raise his left hand. (*Id*. at 17:45:36–43.) Within two seconds of shouting his order, Ramar shot Plaintiff again ("second volley"). (*Id.*) Ramar did not warn Plaintiff before firing the second volley.

- Immediately after Ramar shot the second volley, Plaintiff's body slumped to the right. (Defendant Ramar then yelled, "Show your hands! Show your hands!" Plaintiff's left shoulder visibly twitched but he did not turn or show his hands. (*Id*. at 17:45:43–49.) Ramar then shot Plaintiff again without warning ("third volley"). (*Id.*) It is undisputed that Plaintiff sustained a total of six gunshot wounds, including to his jaw, chest, and left arm.

The Court has confirmed the exact timing of the shots through its own review of the Body

Camera video. Approximately ten seconds elapsed from the time Ramar got off his parked motorcycle (*id*. at 17:45:19–20) and the first volley (*id*. at 17:45:30). Eight or nine seconds elapsed between those first shots and the second volley (*id*. at 17:45:37–38). The third volley (*id*. at 17:45:43–44) took place five or six seconds after the second volley. In sum, no more than fifteen seconds elapsed from the first volley to the third.

Nothing in the record suggests that Olson had any reason to anticipate that Ramar would fire the first volley. In the Court's opinion it is impossible to imagine how a reasonable jury could conclude that Olson had an opportunity to intervene in the subsequent volleys. It is undisputed that the situation was continuously evolving, and that Olson did not have the exact same visual perspective as Ramar. Plaintiff asserts that Olson had the ability to see that Plaintiff was unarmed and not resisting. (PSF ¶ 30.) Even assuming this to be the case, the undisputed timeline of events puts this case in the category of cases where the observing officer (Olson) had essentially no time to intervene. Notwithstanding this conclusion, the Court finds it unnecessary to rule definitively on the constitutional violation prong because the clearly established law prong, discussed below, is dispositive.

### b.  Clearly Established Right

The Court begins its discussion of the second qualified immunity prong with *Penaloza*, 836 Fed. App. 547, the case cited in the MSJ Order's call for supplemental briefing on the failure to intercede claim against Olson. In *Penaloza*, a K9 handler initiated a car stop on a vehicle for an expired registration. *Id*. at 549. The driver of the vehicle initially led police on a chase; once the car stopped, the passenger exited the car and knelt on the ground. *Id*. The K9 handler approached the passenger side of the vehicle intending to send his K9 into the car to bite the driver. *Id*. Fearing that the driver had a gun, the K9 officer shot the driver, who died at the scene. *Id*. Meanwhile, the K9 had been released and bit the passenger for approximately 28 seconds, resulting in serious injuries. *Id*. Viewing the evidence in the light most favorable to the passenger, the Ninth Circuit concluded that the K9 officer was not entitled to qualified immunity as to the passenger's excessive force claim. *Id*. However, another officer who responded to the scene was entitled to qualified immunity for any failure to intervene to stop the K9 from biting the passenger

because existing precedent "does not clearly establish when an officer must intervene." *Id*. at 550.

Plaintiff urges the Court to disregard *Penaloza* entirely because it is unpublished and therefore "is not precedent except as provided by Ninth Circuit Rule 36-1." (Doc. 109 at 6 (citing *Penaloza*, 836 F. App'x at 548 n.*).) Given its unpublished status, *Penaloza* is not binding precedent.[7] Nonetheless, *Penaloza* does frame the key question this Court must examine under the second prong of the qualified immunity analysis: Do prior cases put a reasonable officer on notice of their obligation to intervene under the actual circumstances presented in this case? *See al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *see also Young*, 655 F.3d at 1167 (9th Cir. 2011) ("[T]he relevant inquiry is whether the state of the law at the time of the official conduct complained of was such as to give the defendants fair warning that their conduct was unconstitutional—that a fair application of well-established legal principles would warrant such a conclusion.").

Plaintiff relies on language from a series of cases dating back at least a decade that purport to describe a "duty to intercede." For example, Plaintiff cites *Tobias v. Arteaga*, 996 F.3d 571, 583–84 (9th Cir. 2021), which explains generally that:

> By 2013, we had clearly established that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996)). If an officer fails to intercede, "the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who" performed the offending action. *Koon*, 34 F.3d at 1447 n. 25. For example, "an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights." *Id.*; *see also Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (holding that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" when another official acts unconstitutionally).

---

[7] Several recent district court decisions have cited *Penaloza* for the proposition that there is an absence of caselaw affirmatively defining the scope of an officer's duty to intercede. *See Stroud v. Gore*, No. 18-CV-515 JLS (MDD), 2022 WL 4388287, at *3 (S.D. Cal. Sept. 22, 2022); *Sen v. City of Los Angeles*, No. 2:21-CV-02326-SB-KES, 2022 WL 2236085, at *10 (C.D. Cal. Apr. 20, 2022); *Najarro v. Cnty. of San Diego*, No. 20-CV-1394 W (WVG), 2021 WL 1056586, at *3 (S.D. Cal. Mar. 19, 2021).

1
2
3
4

> "[H]owever, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham*, 229 F.3d at 1289; *see also Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1029–30 (9th Cir. 2002) (no violation of duty to intercede where there was no evidence that the defendant was aware of the constitutional violation as it occurred), *aff'd sub nom. Groh v. Ramirez*, 540 U.S. 551 (2004).

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Though *Tobias* surveys the general outlines of the "duty to intervene," this passage does not settle the question of whether qualified immunity applies to officer Olson's conduct. In *Tobias*, the plaintiff, who was 13 years old at the time, was a suspect in a shooting. *Id*. at 576. He was questioned for 35 minutes by two officers (Cortina and Pere); he was mirandized approximately 20 minutes into the questioning and soon thereafter requested an attorney. *Id*. at 576–77. The officers left the interrogation room, indicating to Tobias that his mother would arrive soon. *Id*. at 577. Instead of Tobias' mother, another detective (Arteagas) entered the room and interrogated Tobias for a further 40 minutes, eventually eliciting a false confession. *Id*. at 577–78. Tobias was convicted at trial, but the conviction was ultimately reversed, and the charges dismissed. *Id*. at 578. Tobias later brought a civil rights suit against the investigating officers and others. *Id*. The district court denied the officers' motion for summary judgment that they were entitled to qualified immunity on plaintiff's failure to intervene claim in very general terms. *Tobias v. City of Los Angeles*, No. 17-1076 DSF (ASX), 2018 WL 6003559, at *9 (C.D. Cal. Sept. 17, 2018) ("Because Plaintiff's constitutional claims survive, a reasonable juror could conclude that Defendants passively participated in the constitutional deprivations that allegedly led to Plaintiff's conviction."). On appeal from that ruling, the Ninth Circuit re-examined the question of whether Cortina and Pere were entitled to qualified immunity on a failure to intervene theory. *Tobias*, 996 F.3d at 583–84. After articulating the general standards quoted above, the Ninth Circuit noted that "neither side presented evidence as to Cortina and Pere's involvement in [the] interrogation" but that there was evidence in the record suggesting that Cortina and Pere were watching Arteaga's questioning of Tobias from a viewing room. *Id*. at 584. Considering this, the Ninth Circuit remanded the issue to the district court to consider whether there were material facts in dispute as to Cortina and Pere's failure to intercede liability. *Id*. Given this procedural history, the language from *Tobias* relied upon by Plaintiff does little more than regurgitate the generic failure to

intervene standard, as it does not truly engage with or reach a conclusion about how qualified immunity applied under the circumstances presented in that case. And if that wasn't enough, the facts of *Tobias* could not be more different than the present case. The unconstitutional interrogation in Tobias took place over the course of 40 minutes, and there was evidence suggesting that Cortina and Pere may have been observing the interrogation from another room that entire time. Here, the shooting unfolded over the course of no more than fifteen seconds.

Plaintiff also relies heavily on *Robins v. Meecham*, 60 F.3d 1436 (9th Cir. 1995). There, an inmate "refused a direct order to lock up." *Id*. at 1438. In response, a correctional officer "fir[ed] a round of bird shot" at the inmate, but a few pellets travelled under another cell door and lodged in another inmate's foot. *Id*. Two other officers were in the "control bubble" with the shooting officer. *Id*. at 1442. Those two officers argued they were entitled to summary judgment because they had not taken any action against either inmate. *Id*. The Ninth Circuit rejected this argument. *Id*. After noting generally that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene," the Ninth Circuit reasoned:

> In none of the affidavits submitted with the officers' motion for summary judgment do any of the officers state they did not have the opportunity to intervene to prevent Officer Meecham from firing the gun. On the other hand, the affidavits of the officers and Robins indicate that all three officers were together in the control bubble. The officers failed to carry their burden of showing that Officers Morris and Cox could not have prevented Officer Meecham from firing the shotgun, or much less that they even disagreed with Officer Meecham's actions. Therefore, the district court did not err in denying the motion for summary judgment as to Officers Cox and Morris.

*Id*.

Notably, *Meecham* dates to the mid-1990s. As a result, the decision does not struggle with defining the clearly established right in the fact specific manner required by more recent Supreme Court precedent. *See al-Kidd*, 563 U.S. at 741. Even still, several more recent district court rulings have relied on *Meecham* to deny motions for summary judgment on qualified immunity grounds in the context of failure to intercede claims. For example, *Segura*, discussed above, dealt with an allegation of excessive force by a prisoner who asserted he was thrown to the ground, kicked, and punched by several sheriff's deputies as they dragged him down the hall to

1   segregation, even though he was not resisting. *Segura v. Miller*, No. 6:20-CV-00911-YY, 2022

2   WL 1492612, at \*1–2 (D. Or. Mar. 28, 2022), report and recommendation adopted in part,

3   rejected in part, No. 6:20-CV-911-YY, 2022 WL 1165728 (D. Or. Apr. 20, 2022). According to

4   the plaintiff's version of events, several other inmates had time to comment that he was not

5   resisting and plead for the officers to stop beating the plaintiff. *Id*. All this took place while other

6   deputies stood by and watched. *Id*. Citing *Penaloza*, 836 F. App'x at 549 (indicating "[o]ur

7   precedent does not clearly establish when an officer has a realistic opportunity to intercede"), the

8   magistrate judge recommended that the observing officers be granted qualified immunity on the

9   failure to intercede claim. *Id*. at \*7. The district court rejected this recommendation, citing *Tobias,*

10  *Meecham*, and other cases, and found instead that the underlying facts are disputed as to whether

11  the observing officers had the opportunity to intercede. *Segura v. Miller*, No. 6:20-CV-911-YY,

12  2022 WL 1165728, at \*2 (D. Or. Apr. 20, 2022). According to the district court in *Segura*, "the

13  law that an officer must intercede when presented with a realistic opportunity is clearly

14  established, even though whether an officer had a realistic opportunity requires consideration of

15  the unique facts in each case." *Id*. Put another way, the district court in *Segura* held that clearly

16  established law does tell officers "when" they must intercede, because they must do so "at the

17  first realistic opportunity." *Id*. However, the *Segura* decision does not engage in the "clearly

18  established law" analysis with any factual specificity. Moreover, the facts of that case are

19  distinguishable given that observing inmates had sufficient time to comment on the use of force to

20  the observing corrections officials. Here, there was no time for commentary between the volleys

21  of shots.

22       The district court in *Knapps*, 647 F. Supp. 2d 1129, also did not evaluate the clearly

23  established law issue in detail. As mentioned, the ruling in *Knapps* found observing officers liable

24  for failure to intervene as to one use of force (a wrist lock) but not another (a carotid hold). *Id*. at

25  1159–60. As to the wrist lock, the court found a constitutional violation because the observing

26  officers were close enough to the officer applying the force, the wrist lock "occurred over a

27  relatively longer period of time" than the carotid hold, and the plaintiff had time to complain that

28  the wrist hold was hurting him. *Id*. at 1160. Having found a constitutional violation, the district

25

1    court in *Knapps* articulated the clearly established right at a high level of generality and found

2    that Rojas and Kelly were not entitled to qualified immunity. *Id*. at 1163.

3           Again, the district court's ruling in *Andrich*, 470 F. Supp. 3d 1048, is more helpful. As

4    mentioned above, in Andrich, two officers attempted to physically restrain a mentally ill plaintiff

5    with their hands and fists and then their tasers. *Id*. Then, as the plaintiff was "turning away," one

6    of the officers shot and killed the plaintiff. *Id*. Plaintiff alleged that the non-shooting officer failed

7    to intervene to prevent the fatal shooting despite having the ability to do so. *Id*. at 1060. The

8    district court concluded that the amended complaint failed to allege facts indicating the non-

9    shooting officer had the opportunity to stop the shooting. *Id*. Importantly for the present analysis,

10   the district court found the doctrine of qualified immunity provided an alternative basis for

11   dismissing the failure to intervene claim against Peters.

> "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A government official's conduct violates "clearly established" law when " 'the contours of a right are sufficiently clear' that every 'reasonable official' would have understood that what he is doing violates that right.' " *Id*. at 741 (citation omitted). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." Id. In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, —– U.S. ——, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quotation omitted).
>
> Here, Defendants explicitly raised the defense of qualified immunity in their motion and cited cases in which courts conferred qualified immunity upon officers in analogous circumstances. (Doc. 33 at 4.) In response, Plaintiffs proffered *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129 (N.D. Cal. 2009), as their best case showing that Officer Peters's conduct violated clearly established law. [ ] Plaintiffs' reliance on *Knapps* is misplaced.
>
> ***
>
> If anything, *Knapps* supports Officer Peters's contention that he is entitled to qualified immunity. *Knapps* suggests that a police officer

cannot be held liable, under a failure-to-intervene theory, when a fellow officer engages in a split-second use of excessive force (there, the carotid hold) and that failure-to-intervene liability is reserved for circumstances where the use of excessive force extends over a "relatively longer period of time," such that other officers in the vicinity have a reasonable opportunity to observe it, recognize its impermissible character, and take action to stop it (there, the bent wrist hold). Here, the SAC does not allege that Officer Peters had any inkling that Officer Kostas was planning to discharge his firearm, let alone a reasonable opportunity to stop Officer Kostas from doing so after realizing what was about to occur.

*Andrich*, 470 F. Supp. 3d at 1062; *see also Williamson*, 2012 WL 1327860, at *5 ("The question on qualified immunity . . . is whether a reasonable person in [the observing officer's] position would have understood that his failure to intervene . . . could result in a violation of Plaintiff's Fourth Amendment rights . . . A reasonable officer could not have anticipated Officer Garrow would react by kicking Plaintiff's cane out from underneath him, causing him to fall to the ground.").

There are other relatively recent district court cases that appear to rely on a general rule that the issue of whether an officer had sufficient time to intercede should be sent to the jury where there are material disputes of fact. *See AGG*, 2020 WL 6047233, at *12 (finding genuine issue of fact because observing officer "had time to—and in fact did—insert herself into the situation and then chose to stop," without discussing clearly established law prong in detail); *Beltran v. Cnty. of San Bernardino*, No. EDCV19-01522-CJC-KKX, 2021 WL 3185474, at *6 (C.D. Cal. Jan. 28, 2021) (relying on *AGG* to find that qualified immunity did not bar a failure to intervene claim from going to a jury where defendant officer was "fifteen to twenty feet" away from where another officer was allegedly beating and tasering the plaintiff; even though defendant officer was dealing with another suspect, she may have been aware of what was happening because of Plaintiff's cries for help).

Other cases have found clearly established law supported a finding that observing officers were not entitled to qualified immunity, but under factual circumstances vastly different from the present case. For example, in *Baros v. Ramirez*, No. 5:17-CV-00948-PSG (SHK), 2022 WL 1206099, at *15 (C.D. Cal. Mar. 3, 2022), *report and recommendation adopted*, No. 5:17-CV-00948-PSG (SHK), 2022 WL 1203005 (C.D. Cal. Apr. 11, 2022), the evidence, viewed in the

light most favorable to plaintiff, indicated that one correctional officer (Ramirez) used excessive force against the prisoner plaintiff as follows: Ramirez pulled plaintiff by his shirt from a bunkbed to the floor, punched plaintiff while he was lying on the ground, handcuffed plaintiff, punched and kicked plaintiff with other officers while plaintiff laid on the floor, slammed plaintiff's head on several metal bunk bed frames, slammed plaintiff's head into a wall made of metal bars, and then slammed plaintiff's head on a metal doorframe. This took place over the course of up to a minute. *Id*. The district court concluded there was no dispute that "a reasonable officer would have known" that "slamming a handcuffed, cooperative pretrial detainee's head into multiple stationary metal surfaces over the course of up to a minute, sufficient to cause the detainee to lose consciousness and to necessitate stitches, violated the detainee's constitutional rights, thereby putting a reasonable observing officer on notice that there was a duty to intercede." *Id*.

The present case does not justify a similar finding. Here, the body cam footage demonstrates that Olson had no indication Ramar would shoot such to give him sufficient time to do anything to prevent Ramar from shooting Plaintiff in any of the three volleys. Plaintiff has pointed to no cases that are even remotely factually analogous, and the Court has been unable to identify any such cases in its extensive independent research. Therefore, the Court finds that Olson is entitled to qualified immunity as to Plaintiff's allegation that he failed to intervene in the shooting.

**B.     Strategic Decisions Before Shooting**

Finally, the Court will briefly discuss Plaintiff's assertion—made almost in passing—that Olson could be liable for his failure to intercede in Ramar's strategic decision to approach Plaintiff's vehicle without waiting for additional resources to arrive. (Doc. 93 at 23; Doc. 109 at 4–5.) The undisputed facts of this case suggest that Ramar's strategic choices were not entirely aligned with MPD policy, and that different strategic choices could have allowed for options other than the use of deadly force in the situation. For example, the Shooting Review Board identified certain "training issues" related to Ramar's conduct:

Sergeant  Ramar  initiated  contact  with  a  known  violent  suspect

without sufficient resources. Additional officers and patrol vehicles would have allowed for other tactical considerations and deployments. Waiting for additional officers could have added additional less-lethal force options and would have likely provided resources needed to isolate the suspect from innocent bystanders.

Sergeant Ramar did not adequately communicate his plan with Officer Olson or with other responding officers via radio. Doing so would have increased clarity for Officer Olson's role as well as given the opportunity for him to ask clarifying questions and provide input. Communicating his plan via radio could have increased situational awareness for other officers as well, before were that and after the officer involved shooting, and would have allowed other supervisors and/or the watch commander to contribute to or modify his plan of action. Sergeant Ramar indicated in his voluntary statement that the immediacy of making contact with Perkins added the element of surprise. I can appreciate that point of view, but it cannot be absent of planning and communication. In this case, that is what happened.

(*See* Doc. 93-3, Declaration of Mark E. Merin, Ex. 27 (pp. 339-340 of 1373); *see also* Doc. 102, Declaration of Aaron Tait, ¶ 22.)

There is caselaw to support allowing the jury to consider Ramar's arguably "unreasonable police conduct prior to the use of force" as part of the totality of the circumstances relevant to assessing whether <u>Ramar's</u> use of force was objectively reasonable, provided that the earlier conduct foreseeably created the need to use the force Ramar eventually employed. *See Winkler v. City of Phoenix*, 849 F. App'x 664, 667 (9th Cir. 2021); *see also Orn v. City of Tacoma*, 949 F.3d 1167, 1176 n.1 (9th Cir. 2020) (refusing to foreclose the possibility of liability where "a police officer unreasonably places himself in harm's way"); *Smith v. City of Los Angeles*, No. 2:19-CV-05370-CAS-JCx, 2020 WL 6545953, *2–4 (C.D. Cal. Nov. 6, 2020) (excessive force analysis under *Graham* "appropriately considers pre-shooting circumstances" including the officers' "pre-shooting tactical decisions").

But it is another thing entirely to suggest that <u>Olson</u> could be liable for failing to intervene to correct Ramar's pre-shooting strategic decisions. In his opposition to the motion for summary judgment, Plaintiff cited two cases in support of his theory that Olson could be liable for "acquiescing" in Ramar's decision to confront Plaintiff without waiting for backup. (Doc. 93 at 23.) First, in *S.R. Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019), the Ninth Circuit found

that a finder of fact could consider—as part of the *Graham* "totality of the circumstances"
excessive force analysis—evidence suggesting that a shooting officer "unnecessarily created [his]
own sense of urgency" which ultimately resulted in that officer's use of deadly force. Similarly,
in *Orn*, 949 F.3d at 1176 n.1, the Ninth Circuit reasoned that a shooting officer's actions that
arguably placed himself in harm's way could be considered when evaluating whether that
officer's subsequent use of deadly force was excessive. Neither case suggests, however, that an
<u>observing</u> officer could be held liable for failing to intervene in another officer's strategic
blunders. For this reason, Olson is entitled to qualified immunity as to any claim against him for
failing to intervene in Ramar's strategic decision-making. *See also Andrich*, 470 F. Supp. 3d at
1061 (D. Ariz. 2020) ("Even assuming that [observing officer] escalated the situation through his
initial use of fist strikes and a taser, such escalation doesn't show that he had the opportunity to
intervene with respect to [shooting officer's] subsequent decision to shoot [plaintiff].").

**CONCLUSION**

For the reasons set forth above, Olson's motion for summary judgment is **GRANTED** as
to Plaintiff's allegation that he failed to intervene in Ramar's use of force against Plaintiff.

The parties are directed to meet and confer and within 21 days of the date of this order
submit a joint status report indicating whether they believe further proceedings are required
before this case is set for trial; alternatively, if the parties believe this case is in a trial posture,
they shall so indicate, and the Court will set a trial setting conference.

The parties are warned that this Court's trial calendar is heavily impacted; it will likely be
impossible to find an open date that will not be double- or triple-booked with a criminal trial,
which must be given priority. As has been reiterated numerous times, consent to the magistrate
judge may alleviate some of these scheduling difficulties. The parties are also informed that it is
this Court's practice to require some form of formal settlement effort before proceeding to trial.

IT IS SO ORDERED.

Dated:   __**May 24, 2023**__

UNITED STATES DISTRICT JUDGE

30